**A.P.N. HOLDINGS CORP., Plaintiff,**

v.

**Ronald HART, Thelma Hart and Barbara Bergen, as Trustees of the Testamentary Trust of Mark M. Hart, deceased; Beatric Hart, as Custodian for Penny Hart and Dean Hart, Infants, Under the New York Uniform Gifts for Minors Act; Ronald Hart and Thelma Hart, Defendants, Counterclaim Plaintiffs, and Third Party Plaintiffs,**

v.

**Abe J. LIEBER; Miriam P. Lieber; Amford Bank & Trust Company, Ltd.; ABT Investments, Limited; Amdall Properties, Inc.; London Capital Corporation; Logistics Control Group International, Ltd., Third Party Defendants.**

No. 83 Civ. 4397 (EW).

United States District Court, S.D. New York.

Aug. 22, 1985.

---

**42.** Tr. at D–96.

Pollack & Kaminsky, New York City, for plaintiff and counterclaim defendant and third party defendants; Frederick P. Schaffer, New York City, of counsel.

Hayt, Hayt & Landau, Great Neck, N.Y., for defendants and counterclaim plaintiffs and third party plaintiffs; Clifford J. Chu, Ralph Pernick, Great Neck, N.Y., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action arises from the 1982 sale of a controlling interest in the American Plan Corporation ("American Plan" or the "Company"), a New York corporation engaged through its subsidiaries in the property and casualty insurance business. Defendants Ronald, Thelma, and Beatrice Hart and Barbara Bergen, individually and in representative capacities, collectively controlled 520,691 shares, approximately thirty-five percent of the outstanding stock of American Plan. On June 25, 1982, plaintiff A.P.N. Holdings Corp. and defendants executed a stock purchase agreement (the "Agreement") whereby plaintiff agreed to purchase defendants' interest at a price of $10 per share, which totalled $5,206,910. Plaintiff paid defendants $520,000 when the Agreement was executed; an additional $1,230,000 when the transaction closed on October 5, 1982; and executed a promissory note for the balance of $3,456,910, which is unpaid and now past due.

The Agreement was negotiated by Abe Lieber, plaintiff's principal shareholder, president, and chairman of the board, and Ronald Hart, then a director and paid consultant of American Plan and formerly its president and chairman of the board, who acted on behalf of all defendants. Plaintiff claims that Lieber and Hart agreed upon a purchase price of $10 per share with the understanding that such price was approximately twice the book value per share of American Plan stock as reflected in the Company's then most recent financial statements filed with the Securities and Exchange Commission ("SEC"); that Hart denied plaintiff access to the Company's books and records prior to the closing date but assured it that the SEC filings fairly and accurately represented the Company's financial condition and, indeed, so warrant-

ed in the Agreement; and that after the closing date when plaintiff gained access to the Company's books and records it discovered that the true book value of American Plan prior to the closing date was $0.51 per share, more than five dollars less than that reflected in the Company's most recent financial statements. In short, plaintiff charges that in assessing the Company's book value, which the parties allegedly understood was the basis of the $10 per share purchase price, it had no choice but to rely entirely upon the Company's publicly filed financial statements and that these statements were inaccurate and incomplete and far overstated the book value of American Plan.

Plaintiff seeks to recover damages of $4,675,805, the difference between the purchase price of $10 per share of American Plan stock and the alleged true value of that stock. In the alternative, plaintiff seeks reformation of the Agreement to reflect a purchase price of $1.02 per share, or twice the Company's alleged true book value of $0.51 per share, and restitution in the amount of $1,218,895, the difference between the purchase price as reformed and the amount plaintiff previously paid defendants as of the closing date. Defendants, in addition to a general denial of plaintiff's claims, emphasize that under paragraph 3.1(c) of the Agreement plaintiff disclaimed reliance upon any representation or warranty by defendants concerning the financial condition of American Plan other than a limited warranty that, to the best of defendants' knowledge, no material adverse change had occurred after the first quarterly report was filed in 1982. Defendants also assert a counterclaim to recover $3,456,910, the balance of the agreed purchase price, from plaintiff under its promissory note and a third party claim against Abe Lieber, his wife, and various affiliates who executed a guaranty of payment by plaintiff (the "Guarantors").

The complaint alleges federal claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934[1] and section 17(a) of the Securities Act of 1933[2] and state claims for breach of contract, breach of warranty, mistake of fact, common law fraud, negligent misrepresentation, and violation of section 352-c of the New York General Business Law.[3] These claims involve different standards of culpability. For example, defendants may not be held liable under section 10(b) of the Securities Exchange Act of 1934 without proof of "scienter,"[4] whereas they may be held liable for damages caused by a breach of warranty upon proof that the warranted facts did not exist.[5] Yet, despite these differences, all these claims essentially rest upon the factual charge that the Company's publicly filed financial statements, upon which plaintiff allegedly relied in agreeing to pay defendants $10 per share for their interest in American Plan, contained errors that misrepresented the Company's book value. Thus, to recover upon any of the asserted grounds, plaintiff must establish by a *preponderance of the evidence* that the financial statements at issue in fact contained the errors as charged.

Plaintiff's claims in large measure center about the application of accounting principles in the insurance industry and alleged errors in American Plan's financial filings, which served as the basis for restating those statements in subsequent filings. The specific financial statements in issue are those contained in the Company's Form 10K for 1981 ("1981 10K") and Forms 10Q for the first three quarters of 1982 ("1982 10Q's"). All parties acknowledge that annual and quarterly financial statements filed with the SEC must be prepared in

---

**1.** 15 U.S.C. §§ 78j(b), 78t(a).

**2.** 15 U.S.C. § 77q(a).

**3.** N.Y.Gen.Bus.Law § 352–c (McKinney 1984).

**4.** *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**5.** *See Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir.1946); *Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908, 928 (E.D.N.Y. 1976), *aff'd,* 560 F.2d 1089 (2d Cir.1977).

accordance with generally accepted accounting principles ("GAAP"). Plaintiff contends that after it took control of the Company, new management and outside auditors discovered, during two successive audits, that these financial statements contained errors under GAAP. First, in conducting the 1982 annual audit, new management and the accounting firm of Alexander Grant & Company ("Alexander Grant") allegedly found the 1982 10Q's in error with respect to the adequacy of the Company's loss and loss adjustment expense reserves and to bad debts owed the Company by two of its agents. Thereafter, in conducting the 1983 annual audit, new management and Peat, Marwick, Mitchell & Company ("Peat, Marwick"), retained in place of Alexander Grant, allegedly found errors in the 1981 10K and additional errors in the 1982 10Q's. These alleged errors concerned reinsurance recoverable by the Company, contingent commissions owed to a leading agent, and the way the Company accounted for two surplus relief treaties, discussed hereafter.

Plaintiff further contends that all of these discoveries were based upon information that was available to old management when it prepared the 1981 10K and 1982 10Q's and that therefore, under GAAP, they constituted "errors" and warranted restatements of the financial statements contained in those filings. As a result of these restatements, which new management included in the Company's Form 10K for 1982 and Form 10K for 1983, the book value of American Plan for the nine months ended September 30, 1982—the last statement date before the closing—allegedly dropped more than $5 per share to $0.51 per share.

An observation is warranted at the outset. After the occurrence of events in issue, Abe Lieber called in one "expert" after another who scrutinized the Company's financial statements and whose efforts, one is justified in concluding, were directed to turning up some "error" that would sustain plaintiff's claim that the book value of American Plan had been overstated. Many of the views of these experts who testified were highly conceptualized and were based upon their opinions as accountants. Against this testimony was that of American Plan's officers, who had been active in the day to day management of the Company's affairs and were familiar with the Company's insurance experience record, accounting practices and requirements. The fact that plaintiff's experts opined as to what they believed were errors in the Company's various financial projections and assignments of debits and credits does not entitle their views to greater consideration than that to be accorded lay persons who demonstrated a thorough understanding of the basic facts in issue.[6] Their credibility as witnesses is subject to appraisal by the same standards as those applied to ordinary witnesses. The Court accepts in substance the judgment of the Company's officers who had the experience of many years in evaluating the various financial matters to which the plaintiff's attack is directed. They were the day to day workers in the vineyard.

Based upon the Court's trial notes, which include its contemporaneous appraisal of each witness, a word by word reading of the stenographic transcript of the trial, the demeanor of the witnesses, an evaluation of their credibility—which in this case played a critical role—and the reasonable inferences to be drawn from established facts and surrounding circumstances, the Court concludes that plaintiff has failed to discharge its burden of proof on the central factual charge in the complaint. It has not established that the old management of American Plan—and thus defendants—acted without justification in preparing the financial statements under attack or that these statements contained the errors charged. As to defendants' counterclaim, and third party claim, there is no dispute that plaintiff has defaulted on two installments of its promissory note. Its only defense—and that of the Guarantors—is

---

**6.** *See Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)

(quoting *United States Smelting Co. v. Parry,* 166 Fed. 407, 415 (8th Cir.1909) ).

the central charge set forth in the complaint, that the 1981 10K and 1982 10Q's contained errors under GAAP that misrepresented the book value of American Plan. Plaintiff's failure to sustain this charge is therefore dispositive of all claims, counterclaims and third party claims.

## LOSS AND LOSS ADJUSTMENT EXPENSE RESERVES

After the closing, Richard Pluschau, a certified public accountant who had served as the Company's outside auditor for over ten years and had considerable experience in the field of insurance, was engaged by new management of American Plan as chief financial officer. He conducted a statistical analysis of the Company's historical claim activity for several prior years in order to determine whether the Company's reserves for unpaid losses and loss adjustment expenses were adequate. Pluschau concluded that as of December 31, 1982 the reserves were inadequate and should be increased by between $2 million and $2.5 million. Thereafter, at Pluschau's suggestion, Huggins & Co., Inc. ("Huggins"), an actuarial firm, was retained by the Company to conduct an independent review of the reserves and it issued an opinion certifying the adequacy of the reserves as revised upward by Pluschau. The question then arose whether this revision should be reflected solely in the fourth quarter of 1982 or also in the first three quarters of that year, as to which the financial statements had already been filed. Pluschau specifically requested Alexander Grant, retained to conduct the 1982 annual audit, to determine whether the Company's financial statements in the 1982 10Q's filed previously should be restated in view of the revision of reserves. Alexander Grant concluded that the financial statements for the first two quarters of 1982 should be restated to reflect an increase in reserves of $774,108 and $1,322,130, respectively.[7]

Plaintiff contends that the restatements were warranted under GAAP because the inadequacy of the reserves could have been discovered by old management when it prepared the 1982 10Q's. Pluschau so concluded because he found no evidence that old management had conducted an analysis of the company's "formula" reserves during the 1982 quarterly financial statement periods. Formula reserves, as distinct from case reserves, which are based upon individual claims already filed with the Company, are estimates of losses incurred but not yet reported to the Company ("IBNR's"), the cost of settling claims ("loss adjustment expense"), and the inflationary impact upon the case reserves. Unlike the case reserves, which are set on a case by case basis as claims are filed with the Company, formula reserves are determined by applying certain formulae to historical claim data; they require an empirical judgement about the likelihood that past loss experience will be repeated. In Pluschau's view, had old management reviewed the formula reserves as of September 30, 1982, it would have found them inadequate. Dominic Esposito, the Alexander Grant partner in charge of the 1982 annual audit, also found no evidence that old management had conducted an overall review of the formula reserves during 1982 and concurred in Pluschau's decision to restate the 1982 10Q's, although he also would have concurred in confining the revision to the final quarter of 1982.[8]

The conclusion of Pluschau, Huggins, and Alexander Grant that the 1982 loss and loss adjustment expense reserves were inadequate was disputed by Murray Lemonik, who was president, chief executive officer, and chairman of the board of American Plan prior to the closing and has been in the service of the Company for fifteen years. While Lemonik did not participate

---

7. These restatements were included in note 13 to the Form 10K for 1982. Plaintiff's exhibit 6, at 43–44.

8. Later in 1983, a second actuarial firm, Tillinghast & Co. ("Tillinghast"), was retained to evaluate the adequacy of the reserves as of December

ber 31, 1982 and concluded that they should be increased an additional $1.5 million beyond the increase recommended by Pluschau and Huggins. Tillinghast based its conclusion, however, on information that was not available until 1983. Record at 753 (testimony of Robert McCausland).

in the reserves review conducted by new management, he opposed the decision to increase the 1982 reserves for two reasons. First, the New York State Department of Insurance had only recently, in mid-1980, completed its triennial examination of the Company and reported that the reserves were adequate, as Lemonik put it, "very close" to being "on the button."[9] Since there had been no change in the Company's personnel who analyzed the case and formula reserves, no change in the instructions given them, and no change in the Company's operations, Lemonik saw no reason to believe that a reserve adjustment was necessary.

Second, new management did not conduct a review of "stale" claims in 1983. Stale claims are reported claims as to which the Company has set reserves but which are no longer active and may be closed out. In Lemonik's view, had new management conducted a case by case review of reported claims in order to identify stale claims, as had been done routinely by old management and as he urged new management to do in 1983, a large number of case reserves would have been reduced or eliminated. Lemonik asserted that his belief had been borne out when new management finally conducted a stale claim review in 1984 and found that case reserves should be reduced by approximately $3.5 million. Based upon prior Company experience, Lemonik stated, some sixty-five to seventy-five percent of that reduction would have related back to claims filed in 1982 or earlier. Lemonik also emphasized that in comparison to case reserves, which new management had not reviewed for stale claims, the formula reserves were only a small part of the Company's total reserves.

In charging that the 1982 10Qs were in error concerning loss and loss adjustment expense reserves, plaintiff assumes that old management reasonably should have conducted a review of formula reserves in 1982. However, in view of Lemonik's testimony, which was highly persuasive, plain-tiff has failed to show that old management acted without justification. Essentially, the Court is presented with a difference of opinion, that of the so-called experts from outside the Company, Pluschau, Huggins, and Alexander Grant, and that of Lemonik, an insider who, while not a certified public accountant, was involved in the day to day operations of the Company for fifteen years and had a realistic view of loss potential based upon his experience. As already noted, the Court is satisfied that this credibility issue should not be resolved in plaintiff's favor.

Plaintiff's further argument that old management conducted a "one way" review of stale claims in the spring of 1982—that is, a review designed to eliminate reserves on inactive claims without assessing the adequacy of reserves on active claims—adds nothing to its charge that the 1982 reserves were inadequate. Alan Brinn, the head of the Company's liability claims department in 1982, testified that such reviews were conducted routinely, though normally at year-end, and that this one was conducted in the usual and ordinary manner. The purpose and effect of such reviews are to bring the Company's reserves up to date to enhance their accuracy, at least with respect to case reserves. Nor is there any significance to Brinn's statement that sometime in 1982 he came to believe that the reserves set for claims under special multiperil policies "might have been a bit light," perhaps by as much as $750,000. He acknowledged that his belief was based upon "speculation" and that "nothing specifically [was] done" to verify it.[10]

In sum, plaintiff has failed to prove that the reserves for losses and loss adjustment expenses reflected in the 1981 10K and 1982 10Q's were inadequate.

### BAD DEBTS OWED BY ESSEX AND BANKERS WAY

Plaintiff charges that prior to the closing date, the Company should have established reserves to cover premiums owed by two

---

9. *Id.* at 412 (testimony of Murray Lemonik).

10. *Id.* at 106–07, 116–17 (testimony of Alan Brinn).

agents, Essex Insurance Brokers, Inc. ("Essex") and Bankers Way Insurance Agency, Inc. ("Bankers Way"), that were not collectible. Because such reserves were not set up, plaintiff contends, the 1982 10Q's failed to reflect a potential loss of $650,000 in bad debts. Based upon the information available in 1982, however, the Court finds that old management did not act unreasonably in concluding that the bulk of these debts was collectible.

As to Essex, new management and its auditors determined that a $400,000 reserve should have been set up during the third quarter of 1982 to cover premiums owed to American Plan by Essex when the agency was placed in conservatorship by the California Department of Insurance on August 20, 1982. Those involved in the day to day operations of the Company at that time, however, estimated that Essex's premium balance totalled between $250,000 and $300,000 and was fully collectible—a view that had substantial support. The principals of Essex had personally guaranteed payment of the agency premium balance, their guarantee was covered in part by an errors and omissions insurance policy, and they had posted collateral to secure some $118,000 of that balance. Moreover, the premiums in issue had been deposited into a trust account in favor of an American Plan subsidiary.

In May 1982, Richard Sumner, then a vice president of American Plan, learned that Bankers Way had ceased producing business for the Company and that its principal, who had personally guaranteed the agency agreement with the Company, "had been removed from the Bankers Way corporate picture."[11] The following month, Sumner met with the principals of the successor corporation and, after determining that the Bankers Way premium balance totalled as much as $200,000, entered into an agreement with them whereby they promised to pay $50,000 to American Plan and to guarantee payment of an additional $50,000 if the premium balance could not be collected from the former principal of the agency. The Company in fact received the initial $50,000 under this agreement during the next eight months; previously, in June 1982, it had commenced an action to recover the remaining balance from the former principal who, in Lemonik's view, was not judgment proof.

Plaintiff has offered no evidence to undermine old management's judgment that the Bankers Way debt was collectible. Rather, it relies solely on new management's contrary judgment that a reserve of $250,000 was necessary to cover the debt. Neither judgment is inherently unreasonable and both may be appropriate under GAAP. GAAP requires that a loss be recognized and a reserve established in a financial statement only when

> [i]nformation available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.[12]

This standard leaves considerable room for judgment in deciding whether a reserve is needed. Indeed, Alexander Grant emphasized that estimating when a loss occurs for GAAP purposes is a difficult task and that new management had taken a "conservative approach" to both the Essex and Bankers Way debts.[13] Plaintiff has not shown it was probable in 1982 that the Essex and Bankers Way debts were uncollectible and that the 1982 10Q's should have reflected a reserve for bad debts.

## REINSURANCE RECOVERABLE FROM SECURITY MUTUAL

In December 1981, the Security Mutual Insurance Co. ("Security Mutual"), one of American Plan's reinsurers, was placed in

---

**11.** *Id.* at 173 (testimony of Richard Sumner).

**12.** Standards of Financial Accounting & Reporting, § 4311.08(a) (1978) (quoted in plaintiff's exhibit 10(a), at 1046) (footnote omitted).

**13.** Plaintiff's exhibit 10(a), at 1045, 1052; *see* record at 152 (testimony of Dominic Esposito).

liquidation by the Illinois Department of Insurance. Despite this fact, American Plan continued to carry reinsurance recoverable from Security Mutual on its books throughout 1982. Peat, Marwick, which American Plan had retained in place of Alexander Grant to conduct the 1983 annual audit, concluded after an investigation that no reinsurance was recoverable from Security Mutual as a result of the liquidation. Accordingly, the auditors concurred in new management's determination that a net receivable of $329,178 listed on American Plan's books as reinsurance due from Security Mutual for losses incurred by the Company prior to the liquidation should have been written off during 1982. In addition, Peat, Marwick concurred in new management's determination that the Company had failed to take account of the fact that these prior losses would continue to develop and would involve loss adjustment expense, and thus would cost the Company even more in terms of unrecoverable reinsurance. Accordingly, Peat, Marwick found proper new management's conclusion that a total of $746,465 should have been written off during 1982 as a result of the liquidation of Security Mutual. The auditors further concluded that, because the write-off was based upon information available in 1982, new management's decision to restate the 1982 quarterly financial statements a second time, now in the Company's Form 10K for 1983, was proper and in accordance with GAAP.[14]

Members of the Company's old management who were familiar with the Security Mutual reinsurance treaty testified that the liquidation of the reinsurer did not have a negative effect on American Plan. According to Luther Williams—who had been with the Company for thirty years, most recently as president and then vice chairman of the subsidiaries, and had primary responsibility for reinsurance—and Murray Lemonik, the Security Mutual treaty provided that when the loss ratio on the reinsured portfolio reached a certain level the Company became obligated to pay an additional, or penalty, premium to the reinsurer until such time as the total premium paid reached a maximum point. This penalty premium, referred to as the "burn cost," amounted to $1.33 for every $1.00 of losses recoverable as reinsurance from Security Mutual. Since the loss experience on the reinsured portfolio had placed the Company in a "penalty situation" at the time of the liquidation, the Company was required under the treaty to pay Security Mutual $1.33 in premiums for every $1.00 of reinsurance it otherwise would have received after the liquidation date, at least until the total premiums paid by the Company reached the maximum.[15] Old management determined, therefore, that any reinsurance receivable from Security Mutual was more than offset by the penalty premiums payable to Security Mutual, so that on balance the amount of reinsurance no longer recoverable from Security Mutual did not represent a net

**14.** This second restatement of the 1982 10Q's was contained, along with the restatement of the 1981 10K, in note 2 to the 1983 Form 10K. Plaintiff's exhibit 7, at 84–88. The evidence does not indicate precisely when the information on which the Security Mutual write-off was based became available or which of the quarterly statements for 1982 were in error and by how much. Note 2 to the 1983 Form 10K states that according to current management a reserve of one million dollars should have been established in the first quarter of 1982 as a result of the Security Mutual liquidation. *Id.* at 84–85. However, the work papers prepared by Peat, Marwick in connection with the 1983 audit focus on whether or not the information on which the Security Mutual write-off was based was available to the Company "at the time the 12/31/82 financial statements were being pre-

pared" and conclude that "an oversight of information available *in March 1983* appears to have occurred." Plaintiff's exhibit 11(a) (emphasis added). In view of these work papers, it is unclear whether the "oversight" was that of old management or of new management and its prior auditors, Alexander Grant, or of both groups.

**15.** Although neither side offered a precise calculation, Murray Lemonik estimated that once in the penalty situation the Company could incur losses amounting to hundreds of thousands of dollars and pay penalty premiums in the corresponding amount before the maximum would be reached. Absent other evidence, it cannot be assumed that the premiums paid were at or near the maximum and that the burn cost was not a significant factor in this instance.

loss to American Plan and did not require a reserve.[16]

According to Paul Zucconi, the Peat, Marwick partner in charge of the 1983 audit, and Robert McCausland, who joined American Plan in 1983 and served as the Company's liaison with Peat, Marwick during the 1983 audit, their determination that a reserve should have been established for reinsurance receivable but no longer recoverable from Security Mutual did take account of the burn cost—that even after a setoff in favor of American Plan, the net receivable from Security Mutual still amounted to $746,465, which should have been written off. However, several factors weaken the force of this testimony. First, and most important, neither Zucconi nor McCausland had the experience that Lemonik and Williams had in calculating the burn cost under the Security Mutual treaty over a period of many years. Although Zucconi stated that he was familiar with this type of reinsurance treaty, his testimony raised doubt about whether he fully understood the significance of the burn cost and how premiums payable were calculated under the treaty. As to McCausland, his accounting background did not include any work with insurance companies when he joined American Plan in 1983. The expertise of these men as certified public accountants is no substitute for a thorough understanding of the Security Mutual treaty, which Lemonik and particularly Williams demonstrated by their testimony.

Second, Alexander Grant, which had conducted the 1982 audit for new management, disagreed with Peat, Marwick's determination that a reserve should have been set up with respect to Security Mutu-al. Thus, the dispute here is not only a battle between old management and new but in some instances a battle among plaintiff's own experts as well, each of whom plaintiff has chosen to rely on at different times and for different reasons. It should be noted that accounting principles themselves are by no means fixed or immutable. At times they are the subject of sharp controversy between the accounting profession and the business community and are revised accordingly from time to time.[17] This fact calls into question not only the authoritativeness of these experts' opinions but also, as was observed previously, the motives of plaintiff in retaining first one accounting firm and then another. Ultimately, plaintiff's claim that old management erred in failing to include a reserve for reinsurance unrecoverable from Security Mutual in the 1982 10Q's arises from a difference of opinion that the Court must resolve on the basis of evaluation of the witnesses. In this instance, the experience of Lemonik and Williams carries at least as much weight as the expertise of Zucconi and McCausland. Thus, it cannot be said that plaintiff has carried its burden of proof that old management acted unreasonably or erroneously in its treatment of the Security Mutual reinsurance treaty.

## CONTINGENT COMMISSIONS PAYABLE TO MARKET

In the late 1960's, an American Plan subsidiary and Market Insurance Corp. ("Market"), a California based insurance agent, entered into an agency agreement that provided for a contingent commission payable to Market based upon the profitability of the book of business Market produced for

---

**16.** Of course, as both Lemonik and Williams noted, the Company would still carry a net payable to Security Mutual in the amount of $0.33 for every dollar of reinsured loss incurred, to which the liquidator could lay claim. Plaintiff did not inquire into whether the Company had properly accounted for this net payable, although Lemonik indicated that the Company did have adequate funds and reserves to make good any claim by the liquidator. In any event, although the testimony is hazy on this point, it appears that as long as the Company was in the penalty situation it would have had to carry the $0.33 net payable on its books whether or not reinsurance was recoverable from Security Mutual. Based on old management's calculation of the burn cost, the mere fact of liquidation did not appear to have a negative effect upon the Company's financial condition.

**17.** For a recent example of the periodic controversies over accounting procedures, see N.Y. Times, Aug. 18, 1985, § 3 (Business), at 4.

the Company. Under this agreement, known as a retrospective commission agreement, Market retained thirty percent of the premiums it produced as a provisional advance commission and paid the remainder to American Plan, which allocated fifteen percent for profit and expenses and the remaining fifty-five percent for prospective payment of claims. Whatever portion of this fifty-five percent was not needed to pay claims was paid back to Market as an additional, or contingent, commission; conversely, if claims exceeded fifty-five percent of premiums, Market was required to return a portion of its provisional advance commission to the Company to make up the difference. Thus, Market's commission depended on the loss experience of the business it produced for the Company.

In or about 1979, a dispute arose between the Company and Market over the determination of the contingent commission. Essentially, Market disagreed with the Company's projections as to losses on the Market book of business that had been incurred but not yet reported. Market believed that the reserves set by the Company for these so-called IBNR losses were excessive and should be reduced and that it was entitled to additional commissions. This dispute persisted until at some point in 1982 Market withdrew a major portion of its business from American Plan and the Company issued a notice of termination of the agency agreement. Thereafter, the termination became effective and Market took legal action against the Company to recover contingent commissions.

· In conducting the 1983 annual audit, new management and Peat, Marwick determined that the IBNR reserves set by the Company on the Market book of business in 1981 and 1982 were excessive in view of the loss experience on that book in prior years. As of December 31, 1982, they concluded, the Market IBNR reserves should have been reduced by approximately $1.23 million. Had the reserves been set at the proper levels, they determined, the Company's financial statements for 1981 and 1982 would have reflected contingent commissions payable to Market. Instead, the financial statements reflected no such pay-

ables in 1981 or 1982 and, indeed, in 1982 allegedly showed commissions *receivable* from Market in the amount of $780,000. Because the prior loss history on which this reserve adjustment was based was available to the Company in 1981 and 1982, new management and Peat, Marwick concluded, the financial statements were in error under GAAP for failing to reflect contingent commissions payable in 1981 and 1982 and for showing commissions receivable in 1982. Consequently, the fourth quarter results in both years were restated in the 1983 Form 10K to reflect a reduction in earnings of $389,000 and $841,000, respectively.

The charge that old management erred by overstating the IBNR reserves on the Market book, and thereby failing to show contingent commissions payable to the agent in either year and showing commissions receivable from it in 1982, is without merit. The essential premise of the charge is that old management's projections as to losses incurred but not reported on the Market book were unjustified. Paul Zucconi, the Peat, Marwick audit partner, testified that the Company had available in 1981 and 1982 a lengthy history of claims actually reported on the Market book over a period of many years, and that this history indicated a steady reduction in loss ratio after 1979. In view of this trend, he asserted, old management should have set lower IBNR reserves. As Zucconi acknowledged, however, setting an IBNR reserve is a matter of judgment based upon historical experience—a projection must be made as to the frequency and severity of future claims. Consequently, in determining whether the Market IBNR was justified, the personal familiarity with the Market book of those who set the IBNR reserves and their reasoning are crucial factors to be considered.

According to Murray Lemonik, the 1981 and 1982 IBNR reserves reflected the lessons that old management had learned as a result of past mistakes. In or about 1976, the Company had paid Market contingent commissions of approximately one million dollars only to see the loss ratio on the

Market book rise steadily thereafter and place the Company for a long period in the position of having to seek recovery of the contingent commissions back from the agent. Old management had found the history of claims actually reported to be an unreliable indicator of future experience. Lemonik explained that because of the nature of the Market book—surety bond coverage—claims often were not reported until many years after the losses had been incurred. Thus, the Market loss experience matured slowly—for instance, what appeared to be a very favorable loss ratio of two percent in 1973 had risen to fifty or fifty-five percent by 1979. In order to protect itself against this phenomenon, known as the "long tail," the Company decided back in 1976, after prematurely paying contingent commissions to Market, to set up a very high supplemental reserve to cover claims incurred but not reported. In short, old management set the reserves for unreported claims at the disputed levels precisely because it had found the history of reported claims—the very history new management and Peat, Marwick relied upon in determining that the IBNR reserves were excessive—to be misleading.

Indeed, Richard Pluschau, who joined new management in 1983, described old management's decision in 1976 to increase the Market IBNR reserves substantially as "a prudent business decision to make sure that the agent was not going to continue to receive contingent commission payments where the reserves might be underestimated."[18] While new management recognized that these reserves might have been redundant as of December 31, 1982, it, too, was reluctant to eliminate the potential redundancy in order to pay Market contingent commissions. Thus, even new management realized, at least initially, that the Company's only hedge against the "long

tail" on the surety bond business was to set the IBNR reserves at a high level.

Paul Zucconi emphasized that the loss ratio on the Market book had declined between 1979 and 1982, but Lemonik stated that this ratio had not "matured" enough to be reliable in 1981 and 1982.[19] Whether old management should have changed its view of the Market loss history between 1979 and 1982 is a matter of business judgment. Plaintiff has not shown that old management acted without justification in continuing to set the Market IBNR reserves at higher levels as they did in 1981 and 1982.

## THE SURPLUS RELIEF TREATY WITH CONTINENTAL

This dispute centers about the accounting treatment given two treaties, or contracts, between American Plan and Continental Casualty Insurance Company ("Continental") in American Plan's 1981 10K and 1982 10Q's. In preparing the 1983 annual audit, new management determined, and Peat, Marwick concurred, that these treaties should not have been accounted for as reinsurance treaties because they did not provide for a transfer of risk from American Plan to Continental as required under GAAP—that they did not, as a practical matter, obligate Continental to indemnify the Company for losses the Company incurred under the policies covered by the treaties. In effect, they assert that the economic substance of the transactions governs rather than the terms of the treaty. In the view of new management and Peat, Marwick, the Continental treaties were intended merely to provide surplus relief,[20] not reinsurance, and should have been accounted for as such. They further determined that by accounting for the treaties as if reinsurance were in effect with Continental, the Company was able to de-

---

18. Record at 677 (testimoney of Richard Pluschau).

19. *Id.* at 519 (testimony of Murray Lemonik).

20. A surplus relief treaty is a form of reinsurance treaty whereby the insurance company cedes a portion of a policy to a reinsurer in return

for a ceding commission that minimizes the drain on the ceding company's surplus and allows it to write more policies. The ceding company pays the reinsurer a guaranteed profit—or interest—over the term of the ceded policy. Generally, surplus relief treaties do not provide for a transfer of risk.

fer more acquisition costs—costs such as taxes and commissions payable upon issuing the policies covered by the treaties—than was proper under GAAP, thereby overstating its earnings by $1,230,000 as of December 31, 1981 and by $2,433,000 as of December 31, 1982.

Paul Zucconi and Robert McCausland testified that whether or not a transfer of risk occurs under GAAP is to be determined by examining the substance of a treaty rather than its form: A theoretical possibility that indemnification will occur under the treaty is not sufficient; GAAP requires that it be likely or probable. Both men found that no indemnification was likely because, while the terms of the treaties provided for indemnification under certain circumstances, none had occurred since at least 1970. Murray Lemonik, a member of old management, confirmed this history. During this prior period, Zucconi found, the only funds that had been transferred between American Plan and Continental had involved interest payments by the Company to Continental in return for surplus relief. In addition, McCausland calculated that under the terms of the treaties the indemnification provisions could not have come into play in 1981 or 1982 unless the loss ratios on the reinsured policies in those years had been double the historical average dating back to the mid-1970's. He further noted that, because Continental's obligation to indemnify the Company depended upon the cumulative loss experience on the reinsured portfolio, indemnification became less and less likely with each passing year of favorable loss experience.

Murray Lemonik, Luther Williams, and Richard Pluschau, each of whom, as previously noted, had worked with the Continental treaties over a period of years, unequivocally testified that the treaties involved a transfer of risk. They all emphasized that just because no indemnification had occurred in the past did not mean that none could occur in the future and that it could occur if losses on the reinsured policies exceeded certain limits. Pluschau calculated that Continental would have incurred an underwriting loss under one of the treaties

had the loss ratio on its own exposure exceeded approximately seventy percent. He acknowledged that the loss ratio as to American Plan's exposure would have to be higher because of the deductibles the Company was required to pay under the treaties, and he did not indicate whether the seventy percent figure reflected annual or cumulative loss experience. Nevertheless, even if indemnification would have occurred only when the annual losses reached unusually high levels, even double the historical average, as McCausland claimed, it is not unrealistic to conclude that such levels could be reached in the event of a catastrophic loss such as might result from a flood, landslide, lightening storm, or brushfire, with which, it may be noticed, certain parts of the country have recently been plagued. Plaintiff's witnesses did not address this possibility.

It is also significant that the New York State Department of Insurance, to which the Continental treaties were submitted for regulatory approval, had in 1978 refused to approve one of them because in effect it did not provide for a transfer of risk. The treaty was redrafted in light of the Department's objections and thereafter was approved. Prior to the closing the most recent approval given by the Department was in 1981. Paul Zucconi emphasized that state regulators apply statutory accounting principles and are not concerned about transfer of risk, which is significant for accounting purposes only under GAAP. Nevertheless, that state regulators may not be concerned about transfer of risk in general does not mean that when they do consider the issue, as they did here, their views are entitled to no weight.

As in many of the matters discussed herein, the dispute over the accounting treatment given the Continental treaties is, at bottom, one of opinion. Each side presented evidence that contradicted and in some degree weakened the force of the other side's position but ultimately did not disprove it. As noted earlier, the business judgment and personal experience of those responsible for managing the Company's affairs on a daily basis carry considerable

weight when their conduct of those affairs is at issue. The Court finds that plaintiff has not shown that the accounting treatment given the Continental treaties was erroneous.

█ In sum, plaintiff has failed to carry its burden of proof on the central factual charge in the complaint—that the 1981 10K and 1982 10Q's contained errors that misrepresented American Plan's book value. Thus, the degree of defendants' personal involvement, if any, in the preparation of those financial statements and of plaintiff's reliance upon them need not be determined. For the reasons that plaintiff has failed to sustain its claims, it and the Guarantors have failed to establish their affirmative defenses to defendants' counterclaim and third party claim. Judgment may be entered in defendants' favor, therefore, on the principal claims, the counterclaim against plaintiff, and the third party claim against the Guarantors in accordance with the terms of the guaranty.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.