**PITTSBURGH COKE & CHEMICAL COMPANY, Plaintiff-Appellant,**

v.

**Louis J. BOLLO, Defendant-Appellee.**

**No. 906, Docket 76–7565.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1977.

Decided Aug. 12, 1977.

Allan L. Blumstein, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Anthony M. Radice, Bruce L. Owens, New York City, of counsel), for defendant-appellee.

Paul W. Williams, New York City (Cahill Gordon & Reindel, Floyd Abrams, James J. Foster, Richard C. Hsia, New York City, of counsel), for plaintiff-appellant.

Before MOORE, SMITH and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

A business transaction between Louis J. Bollo, defendant-appellee, as seller of his controlling stock in Standard Aircraft Equipment Company ("Standard"), to Pittsburgh Coke & Chemical Company ("PCC"), plaintiff-appellant, comes before us for review. PCC appeals a judgment of the District Court, after a non-jury trial, dismissing the complaint. The facts are set forth in a lengthy and painstaking analysis by the District Court in an opinion reported at 421 F.Supp. 908. Only such facts as are necessary for a resolution of alleged errors therein need be repeated.

PCC wished to buy Bollo's Standard stock. In this desire it was not without competition. Premier Industries ("Premier") had the same desire. PCC prevailed and a contract to purchase was executed on December 20, 1968. The closing date was originally set for a date not later than June 30, 1969, a date postponed to September 18, 1969 because of delay in obtaining SEC and CAB clearances.

The controversy arises in part out of a provision in the December 20, 1968 contract (paragraph 6(d) thereof) that:

"(d) The representations and warranties contained in Paragraph 2 of this Agreement shall be true and correct as of the Closing Date, with the same force and effect as though they had been made at the Closing Date, and there shall have been delivered to Purchaser the certificate of Bollo, President of Standard, dated the Closing Date to such effect, . . ."

The representations and warranties in Paragraph 2 included the following:

"(f) Since December 31, 1967, there has been no material adverse change in the financial condition or in the business or operations of Standard."

As required by paragraph 6(d), Bollo delivered the certificate which reads in part:

"(f) Since December 31, 1967, there has been no material adverse change in the financial condition of the company as evidenced by most recent balance sheet information except that, as you know, earnings in 1969 have been reduced due primarily to the investment in start up expenses of our Kansas City operation."

PCC, as plaintiff-appellant, claims that an alleged failure by Bollo to disclose events adverse to Standard between the contract date and the closing date constituted (1) fraud under Rule 10b–5 of the Securities and Exchange Act of 1934; (2) breach of the warranties contained in the December 20, 1968 agreement and Bollo's certificate; and (3) common law fraud (an argument not pressed in this appeal).

The alleged non-disclosure may be briefly summarized. Standard's business consisted primarily of buying parts and equipment from manufacturers at a discount and reselling them for use in airplanes. Standard's principal suppliers were Bendix Aviation Corporation and Whittaker Corporation. The suppliers had the right to unilaterally alter the discount rate and to terminate the agreements on short notice.

Prior to the December 20, 1968 agreement, Bendix had reduced its discount rate and Whittaker had indicated that it might discontinue its relationship with Standard in favor of its own subsidiary. Despite the

Bendix discount reduction, Standard's sales of Bendix parts increased from $3,921,000 (1965–1967) to $4,883,000 (1968–1970). After the signing of the December 20 agreement, Whittaker advised Standard that it would sell through its own division. Bendix took the same position.

Critical to the issue of non-disclosure is the presence on the scene of Putnam B. McDowell, a vice-president and director of PCC. McDowell "had heard considerable information about Standard Aircraft from [his] own associates . . ." (Tr. 52). He signed the December 20, 1968 agreement.

The gravamen of PCC's claims of error is the District Court's statement in its opinion that:

"For purposes of a Rule 10b–5 claim, events occurring after the commitment to purchase stock has been made are irrelevant. Issues of non-disclosure, misrepresentation, materiality and reliance are to be determined by the situation and knowledge of the parties at the time they committed themselves, and not on the basis of subsequent events, even though they occur prior to 'the formal closing date when the delivery and payment are formally completed and cleared.' *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890 (2d Cir. 1972)." 421 F.Supp. at 923.

We do not need to decide whether the District Court should have considered events occurring between the contract and closing dates, because the District Court in fact *did* consider those events and concluded nonetheless that PCC had failed to sustain its charges of fraud and non-disclosure. We agree with that conclusion.

Ample evidence supports the District Court's findings that "PCC—itself the owner of a commercial airline, a sophisticated investor and an 'insider' of Standard—had unrestricted access to Standard's basic business data upon which its investment decision was based" and that "PCC availed itself of such access to the extent considered pertinent". 421 F.Supp. at 924. There was

no proof that McDowell did not receive whatever material he requested or that he did not have complete access to Standard's books and records. As the District Court said:

"Indeed, McDowell's detailed review of Standard's branch operations and business prospects is the most convincing evidence that nothing material was misrepresented or concealed from PCC." 421 F.Supp. at 926.

A review of the record supports the District Court's conclusion that:

"In sum, far from proving fraud, the facts and circumstances developed in the evidence establish the absence of any material non-disclosures or misrepresentation of fact. It also clearly appears that PCC was the active, sophisticated seeker of investment opportunities; that in acquiring Standard it acted in accordance with well-defined long range investment objectives; that PCC's representatives were men of business skill and acumen well able to deal with Bollo, who took full advantage of the protracted opportunity they had to examine the financial status of Standard prior to closing the deal; and that the acquisition was consummated on the basis of PCC's own assessment of Standard and its compatibility with PCC's entry into the airline business and not in reliance upon the matters alleged in this suit." 421 F.Supp. at 926–27.

PCC had every opportunity to familiarize itself with Standard's business situation up to the time of the closing. It was not cut off from any knowledge of Standard's affairs as of, or after, December 20, 1968. To the contrary, PCC's representatives remained as financial watch-dogs until the closing. And despite the District Court's belief that post-December 20, 1968 events were "irrelevant", the Court admitted proof as to events in the intervening period and relied thereon in its opinion. We, therefore, affirm its conclusion of an "absence of any material non-disclosures or misrepresentations of fact." 421 F.Supp. at 926.

PCC asserts as a second claim that by failing to write off sufficient amounts of Standard's inventory, Bollo breached his warranty that

"(e) . . . all . . . financial statements [of Standard] have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved. . . ."

The term "generally accepted accounting principles", as used in the sale of Standard to PCC, should not be interpreted *in vacuo* but only in relation to the particular type of business involved. "Generally accepted accounting principles" are not synonymous with any specific inventory write-off policy. The unique nature of Standard's business should make it self-evident that its retention of parts and equipment for substantial periods of time and its ability to supply some old part when needed were one of the foundation stones on which its business had been built. As the District Court found, these were "parts infrequently or rarely required but productive of goodwill when available to customers who needed such a part quickly and could not obtain it from the manufacturers." 421 F.Supp. at 927. The practice of Standard in handling its write-off policy must be judged in relation to its own operation, and not by any stereotype accounting formula. Furthermore, PCC was apparently not buying Standard to liquidate it but to operate it as a going concern—hence a continuance of its write-off policy might well have been indicated. Nor does the fact that in 1970 PCC chose to make substantial additional write-offs bespeak either a previous inaccurate or fraudulent handling of inventory by Standard.

Of primary importance to a just solution of the Bollo-PCC controversy is the fact that at all times Standard's business operations were to PCC an "open book". 421 F.Supp. at 922. From the commencement of negotiations to the closing date there was no concealment or misrepresentation of information essential to the transaction. Had Bollo advised PCC that the possibility that Bendix and Whittaker might cancel Standard's distributorship would leave

Standard in dire financial straits, thereby inducing PCC to withdraw from the purchase agreement, he might have been the defendant in a suit for depriving PCC of an excellent business opportunity, because 1972 saw Standard's sales reach an all time peak of some $10,000,000. Thus, PCC's judgment to buy may not have been clearly erroneous.

Judgment affirmed.