## Vito S. Cardone *vs.* Boston Regional Medical Center, Inc.[1]

No. 02-P-768.

Essex. October 16, 2003. - December 16, 2003.

Present: Lenk, Smith, & Kafker, JJ.

*Contract,* Construction of contract, Employment, Physician, With hospital, Interference with contractual relations. *Doctor,* Employment. *Hospital. Practice, Civil,* Summary judgment. *Evidence,* Hospital record, Privileged communication. *Privileged Communication.*

In a civil action brought by a doctor alleging breach of a contract to provide professional medical services and management services to a fertility center at the defendant hospital, a Superior Court judge erred in granting summary judgment in favor of the hospital on so much of the plaintiff's claim as alleged that the hospital made improper adjustments to revenue, where the language of the contract regarding the treatment of the adjustments was ambiguous, and the extrinsic evidence in the record did not resolve the ambiguity. [186-188]

In a civil action brought by a doctor alleging tortious interference with a contract to provide professional medical services and management services to a fertility center at the defendant hospital, a Superior Court judge erred in granting summary judgment in favor of the hospital without the hospital having moved for summary judgment on that count, thereby depriving the plaintiff of an opportunity to respond; moreover, although the standard for proving tortious interference is a high one, it was premature to conclude that the plaintiff would not have been able to prove tortious interference, in that the plaintiff presented evidence that raised genuine issues of material fact about improper means used by the hospital in deducting revenues as part of the calculation of the plaintiff's compensation and improper motive on the part of the hospital in seeking to remove the plaintiff and take for itself the profitable fertility center. [188-191]

In a civil action arising out of the plaintiff doctor's contract to provide professional medical services and management services to a fertility center at the defendant hospital, a Superior Court judge properly denied the plaintiff's motion to compel production of the fertility center's patient records, with

[1]The complaint originally named New England Sanitarium & Benevolent Association, doing business as New England Memorial Hospital, as a defendant. The name of that entity was subsequently changed to Boston Regional Medical Center, Inc. (BRMC), and leave was given by this court to amend its name.

the exception of "aged accounts," where the judge's limitations on discovery were consistent with concern for the patients' rights of privacy. [191-192]


CIVIL ACTION commenced in the Superior Court Department on October 12, 1993.

A motion to compel production of documents was considered by *Isaac Borenstein*, J., and a renewed motion to compel production of documents was heard by him; the case was heard by *Robert H. Bohn, Jr.*, J., on motions for partial summary judgment, and separate and final judgment was entered by *Diane M. Kottmyer*, J.

*Eric P. Finamore* for the plaintiff.

*Charles R. Bennett, Jr.*, for the defendant.

KAFKER, J. Dr. Vito Cardone, the plaintiff, entered into an agreement (Agreement) with MedTeam Management Services, Inc. (MedTeam), on February 1, 1989, to provide professional medical and management services at the Fertility Center (Fertility Center or Center) of the Boston Regional Medical Center (BRMC). The Agreement was to run until September, 1994. Disagreements arose, however, over how the plaintiff's compensation was calculated, and in October, 1993, the Agreement was terminated.

Dr. Cardone filed a scattershot twenty-three count complaint against numerous defendants alleging various claims for damages arising out of the Agreement.[2] The defendants moved for partial summary judgment.[3] The plaintiff now appeals from the summary judgment entered for BRMC as a separate and final

---

[2]In addition to BRMC, the complaint named as defendants: MedTeam; Francisco J. Perez, who was president of MedTeam and president and chief executive officer of BRMC; New England Healthcare Corporation (New England Healthcare), which was MedTeam's corporate parent; and Atlantic Adventist Healthcare Corporation (Atlantic), parent company of both New England Healthcare and BRMC. This appeal involves only the plaintiff's claims against BRMC, but we refer to all of the original defendants collectively as "defendants."

[3]We briefly recite the relevant procedural history. The defendants MedTeam, BRMC, and Perez filed a partial motion for summary judgment. A Superior Court judge allowed the motion in part and denied the motion in part. The same judge also allowed a motion for summary judgment brought by the

judgment on so much of the plaintiff's breach of contract claim (count II) as alleges that BRMC made improper adjustments to revenue, and count VI, alleging that BRMC tortiously interfered with the Agreement between the plaintiff and MedTeam.[4] The plaintiff also appeals the denial of his motion to compel production of confidential Fertility Center records relating to patient services and billing.

The Agreement provided that the plaintiff's compensation was based on two elements: (1) payment for the patient care services he rendered, and (2) payment for the administrative services he provided as director of the Center. This dispute specifically concerns the second element, the "administrative employment compensation." According to the Agreement between Dr. Cardone and MedTeam, he was to receive as "administrative employment compensation" annually, "the lesser of seventy percent (70%) of the Center's net revenues . . . or $750,000."[5] It was "payable ninety (90) days after the end of [MedTeam's] fiscal year."

The Agreement, which the defendants drafted, provided that

defendants Atlantic and New England Healthcare as to all of the claims against them.

The plaintiff filed a motion for separate and final judgment pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), on some of the counts on which the defendants' motions for summary judgment had been allowed. A second judge of the Superior Court allowed that rule 54(b) motion, and entered judgment as requested by the plaintiff on October 3, 2000. The plaintiff appealed from that judgment, and this court, in an unpublished decision, affirmed in part and reversed in part. *Cardone* v. *Perez*, 57 Mass. App. Ct. 1103 (2003). See note 18, *infra*.

While that appeal was pending in this court, the plaintiff filed another motion for separate and final judgment on two other counts on which the defendants' motions for summary judgment had been allowed by the first judge. A third judge of the Superior Court allowed the motion, and entered judgment accordingly on July 19, 2001. This opinion concerns the plaintiff's appeal from that judgment, as well as the denial of the plaintiff's motion to compel production of documents.

[4]Count II alleged BRMC "charged collection fees in excess of those permitted by the Agreement and otherwise reduced compensation due to Dr. Cardone." Count VI alleged that BRMC did "unlawfully and maliciously induce, persuade and coerce MedTeam to break its contract with the Plaintiff to permit [BRMC] to take control of the Fertility Center."

[5]Dr. Cardone asserts that this cap was never intended to be enforced. That allegation is not part of this appeal.

MedTeam was to calculate the net revenue of the Center "based upon the following items of revenue and expense and in accordance with generally accepted accounting principles." Revenue was to "include all collected revenues for management fees received by [MedTeam] arising out of services rendered in the Center to the Center's patients."[6] Expense items were to "include both operating and capital costs (including marketing expenses, salaries, benefits, supplies, rental charges, depreciation and interest)."

Also in place was a management agreement between MedTeam and BRMC. The management agreement provided that MedTeam would manage the Fertility Center on behalf of BRMC. "As compensation for its management services under [the management] agreement, [BRMC] agrees to pay to MedTeam a fee equal to the Center's gross collections for services performed in the Center, . . . after deduction of [BRMC's] monthly costs of renting the facilities used by the Center and of services, supplies and materials provided by [BRMC] to patients treated at the Center, which amounts shall be retained by [BRMC]." According to BRMC, this fee was the "collected revenues for management fees" referred to in the Agreement between Dr. Cardone and MedTeam.

Dr. Cardone argues that he was not fully compensated under the terms of his Agreement on account of three adjustments BRMC made to "collected revenues for management fees"; these adjustments are not expressly described in either the Agreement or in the management agreement between MedTeam and BRMC.[7]

First, a deduction was made to reflect what has been referred to as the "Blue Cross contractual allowance" or the "Blue

---

[6]Distinctions were drawn between revenues generated inside and outside the Center. Revenue was to "include charges for hormones, endocrinology tests and [BRMC] fees for infertility treatment services rendered in the Center, but shall exclude [BRMC] radiology and other ancillary services rendered to patients outside the Center."

[7]These adjustments involved deductions made from the technical component of collected revenues. These revenues were billed and collected by BRMC. The technical component involved aspects of patient care ancillary to physician examinations and evaluations. In the Fertility Center, a "high-tech" unit, the technical component "on average" exceeded the professional component.

Cross settlement." Each year, Blue Cross only paid BRMC a percentage of the face value of BRMC's total charges. According to the affidavit of Russell Wetherell, an officer of both BRMC and MedTeam, "[t]he process worked this way. Blue Cross would pay [BRMC] on an interim basis, usually in the range of about 93% of the face amount of its charges. At the end of a given year, however, Blue Cross and [BRMC] would then perform a 'settlement,' in which total charges for the year were subjected to a complicated formula," which usually resulted in a percentage recovery below 93%. Final resolution of the settlement might not be completed until "some times, much much later after the end of the year," and it would come in the form of a bill from Blue Cross.

The second adjustment was a deduction for the uncompensated care pool, a share of which each hospital in Massachusetts is responsible. According to Wetherell, "[a]t the end of each year, the Commonwealth would add up the entire cost of free care at all Massachusetts hospitals, and then express the cost as a percentage of total hospital revenues. Each hospital then had to compare its actual percentage of free care to this ideal percentage," and if its percentage was lower (i.e., if its percentage was 10% and the Commonwealth's percentage was 12%), it would then have to contribute the percentage difference of its revenues (i.e., 2%) to the uncompensated care pool. The working out of this charge-back could take years. The plaintiff claims that the Fertility Center did not serve indigent patients. The record also does not explain BRMC's methodology for allocating its uncompensated care bills to the Fertility Center.[8]

The third adjustment reflected revenues set aside by BRMC, known as "deferred revenue," to account for a "charge cap" imposed by the Commonwealth of Massachusetts. According to Wetherell, "the charge cap was a consequence of the tight reimbursement controls, and relatively low reimbursement levels, of government programs such as Medicare and Medicaid.

---

[8]Nor does the record provide information regarding the customary practices in the industry, i.e., whether fertility services are provided to indigent patients elsewhere or whether hospitals allocate their over-all uncompensated care costs to such units.

The Commonwealth's concern was that hospitals might try to make up what they perceived as shortfalls in reimbursement from government programs by increasing the rates that they charged to private payers such as health insurers and patients who paid their own bills. . . . In order to make sure that didn't happen, the Commonwealth annually calculated the amount of 'private' revenue that it thought each Hospital should earn in that year" and established a "charge cap." According to Wetherell, "[p]rivate revenues that exceeded [that] cap were . . . eventually . . . returned to the Commonwealth." The charge cap was discontinued by legislation in 1991, but it took several years for the settlements to work out. Any surpluses were paid into the uncompensated care pool. The record does not explain BRMC's methodology for allocating these costs to the Fertility Center.

Dr. Cardone asserts that the three adjustments were not discussed between or contemplated by the parties during the negotiation, execution, or operation of the Agreement.[9] An earlier unsigned version of exhibit C to the Agreement, prepared by the defendants, described revenue as including "all charges, net of contractual allowances, bad debt and free care." Why this language was replaced with the phrase "collected revenues for management fees" is unclear from the record. The three adjustments discussed above were also not made during the first two years the plaintiff's Agreement with MedTeam was in effect.[10] Beginning in 1991, Dr. Cardone requested, but did not receive from MedTeam, an accounting of the manner in which net revenue was calculated. Dr. Cardone objected, through his attorney, to these adjustments, which substantially reduced his earnings, and sought payment of the monies he alleged he was owed under the Agreement. According to his answers to interrogatories, the plaintiff was substantially undercompensated on account of these adjustments. Dr. Cardone attributes a direct loss of approximately $1,914,206 to the allegedly unauthorized

---

[9]In their depositions, Perez and Wetherell also appear to state that the adjustments were not addressed until after the Agreement was signed.

[10]There is some question whether the charge cap was exceeded during the first two years.

adjustments from 1991 to 1993.[11]

Finally, as represented in his answers to interrogatories, the plaintiff's experts were expected to testify that the Agreement, when read as a whole, contemplated cash basis accounting, and that the reference to "generally accepted accounting principles" was only meant to "evoke the habitual use of prudent and widely recognized procedures in the conduct of financial affairs," not "the technical definition of the term as used by specialists . . . that expressly excludes cash accounting."[12]

In his memorandum of decision on the defendants' motion for partial summary judgment, the Superior Court judge described the contract as follows: "At first glance, the [Agreement] seems clear as to the billing and administrative fee. Upon further examination, however, it is at best ambiguous; at worst, a hodgepodge of language designed to meet either party's needs at any time." He therefore denied summary judgment on breach of contract claims involving MedTeam's 7% billing and administrative fee.[13] He nevertheless allowed summary judgment on so much of the breach of contract claim against both MedTeam (Count I)[14] and BRMC (Count II) as concerned the adjustments to revenue. He did so because the Agreement calculated net revenues according to "generally accepted accounting principles" (GAAP), and the Blue Cross settlement was made according to GAAP, as elucidated by the American Institute of Certified Public Accountants Audit and Accounting Guide, Health Care Organizations, and "[t]he remaining two

---

[11]The relationship, if any, between the $1.9 million figure alleged by the plaintiff and the $750,000 "administrative employment compensation" cap imposed by the Agreement is not before us, and we do not discuss it. See note 5, *supra.*

[12]The interrogatories contend, for example, that MedTeam kept its records on a cash basis of accounting.

[13]According to the Agreement, MedTeam was to charge a 7% billing and administrative fee. The plaintiff disputes which monies the fee applied to. That dispute is not part of this appeal.

[14]Count I was included in the first separate and final judgment, but was not part of the plaintiff's appeal to this court, even though MedTeam was the signatory to the Agreement with the plaintiff. This court thus did not review the propriety of the allowance of the summary judgment motion as to Count I in its unpublished decision. See note 3, *supra.*

adjustments were . . . based on advice from defendants' auditors." He also allowed summary judgment on the tortious interference with contract claims against both Perez (Count IX) and BRMC (Count VI), even though summary judgment was only sought against Perez.

*Discussion.* 1. *Summary judgment.* "If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment. . . . Where, however, the contract . . . has terms that are ambiguous, uncertain, or equivocal in meaning," the intent of the parties may depend on disputed facts requiring a trial. *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002). See *Affiliated FM Ins. Co.* v. *Constitution Reinsurance Corp.*, 416 Mass. 839, 845-846 (1994) (reversing allowance of summary judgment where contract language was ambiguous and evidence of trade usage, an undeveloped question of fact, was required to interpret contract); *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998) (term is ambiguous "if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one").

a. *Adjustments to revenue.* The Agreement language regarding the treatment of the adjustments is ambiguous. The Agreement does not expressly address any of the three adjustments. Nor does the management agreement between MedTeam and BRMC. The definition of "collected revenues for management fees" is also too general, without a further explanation that is not provided, to be read as unambiguously excluding or including the three complicated adjustments. This lack of definition is particularly problematic as the adjustments were not even specific to the Fertility Center, but rather were imposed on BRMC as a whole, which then allocated the costs of the adjustments to the Fertility Center based on a methodology that is not explained in the Agreement or elsewhere in the record.[15] The expenses and deductions allowed in both the Agreement and the

---

[15]We note that hospital cost allocation, in general, is notoriously arcane and difficult. Contract language regarding cost allocation therefore needs to be carefully drafted to avoid the troublesome ambiguities present here. In the event of litigation, where contract language is ambiguous, the record needs to provide the necessary background information regarding the specific practices, as well as those that are customary in the industry, which is absent here.

management agreement between MedTeam and BRMC are also focused on items such as the cost of renting the Fertility Center space or the "services, supplies and materials provided by [BRMC] to patients treated at the Center," not BRMC-wide adjustments. The remainder of the Agreement, which was drafted by the defendants, does not resolve the uncertainties.[16]

The extrinsic evidence in the record does not resolve the ambiguity. The plaintiff has submitted evidence that the three adjustments were never addressed during the negotiation of the Agreement. Earlier drafts of the Agreement referenced the Blue Cross contract allowance, and possibly the uncompensated care adjustment, but that language was dropped from the Agreement for unexplained reasons. For the first two years of the Agreement, no adjustments were made by the defendants. See Restatement (Second) of Contracts § 202 comment g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning"). Once the defendants made the adjustments in the third year, the plaintiff objected and demanded an accounting.

BRMC contends that the language in the Agreement providing that the calculation of "net revenue" will be done "in accordance with generally accepted accounting principles" compels recognition of the three adjustments. However, according to the plaintiff's answers to interrogatories, he was prepared to offer expert witnesses with specialized knowledge in the areas of health care and tax accounting to dispute this contention. Suffice it to say that the accounting practices alluded to in the Agreement are uncertain and disputed on this record and will apparently require expert testimony. This was

---

[16]The remainder of the Agreement does not, for example, meaningfully clarify the over-all permeability or impermeability of the financial relationship between BRMC and the Center for the purpose of calculating "collected revenues for management fees." The court has in certain circumstances, particularly contracts of adhesion, interpreted ambiguity against the drafter of the contract, albeit recognizing that this "rule of construction 'must give way to the primary and inflexible rule that . . . contracts, are to be construed so as to ascertain . . . the true intention of the parties.' " *Shea* v. *Bay State Gas Co.*, 383 Mass. 218, 225 (1981), quoting from *Teeples* v. *Tolson*, 207 F. Supp. 212, 215 (D. Or. 1962). See *Merrimack Valley Natl. Bank* v. *Baird*, 372 Mass. 721, 724 (1977); *Affiliated FM Ins. Co.* v. *Constitution Reinsurance Corp.*, 416 Mass. at 845.

not a routine, mechanical, mathematical exercise. See generally *Pittsburgh Coke & Chem. Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir. 1977) ("The term 'generally accepted accounting principles' . . . should not be interpreted in vacuo but only in relation to the particular type of business involved" and company's own operation); *A.P.N. Holdings Corp. v. Hart*, 615 F. Supp. 1465, 1476 (S.D.N.Y. 1985) ("As in many of the matters discussed herein, the dispute over the accounting treatment . . . is, at bottom, one of opinion"). The solitary, passing reference to "generally accepted accounting principles" in the Agreement does not resolve the contractual question regarding the authorization of the three disputed adjustments in this particular contract.[17]

In sum, the determination whether "collected revenues for management fees" and the other ambiguous contract provisions at issue allow or disallow the three adjustments depends on undeveloped or disputed evidence regarding (1) the bargaining history of the parties; (2) the cost allocation methodology of BRMC and perhaps other hospitals similarly situated; and (3) generally accepted accounting principles and practices in the health care industry.

b. *Tortious interference.* The Superior Court judge also allowed summary judgment on Count VI of the complaint entitled "Malicious Interference with Contract — Cardone v. [BRMC]."

---

[17]Although not argued by either party, we note that the Agreement was between Dr. Cardone and MedTeam, not Dr. Cardone and BRMC. The Agreement did provide, however, that MedTeam was managing the Center "on behalf" of BRMC. There are also disputed facts regarding the intermingling and overlapping of authority between the two entities concerning the determination of "collected revenues for management fees." BRMC, not MedTeam, billed and collected the technical component of these revenues. It then subtracted certain expenses pursuant to its separate management agreement with MedTeam before paying over the remainder to MedTeam as "collected revenues for management fees." Whether, therefore, BRMC, as alleged in Count II, is the contracting party, because the "corporate veil" has been pierced, see, e.g., *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968); *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 732-733 (1991), or instead the party interfering with the contract, as alleged in Count VI, must be resolved at or before trial. A party cannot tortiously interfere with its own contract. See, e.g., *Appley v. Locke*, 396 Mass. 540, 543 (1986); *Saint Louis v. Baystate Med. Center, Inc.*, 30 Mass. App. Ct. 393, 404 (1991).

Dr. Cardone contends that the Superior Court erred because BRMC had not moved for summary judgment on this count, thereby depriving him of notice and an opportunity to respond. Even if the court could act sua sponte, Dr. Cardone continues, summary judgment was inappropriate. The plaintiff essentially argues that BRMC made the disputed adjustments, knowing them to be inappropriate, in order to address its own financial difficulties. He also contends that BRMC interfered with his Agreement so that it could remove him and take for itself the profitable Fertility Center and its outstanding accounts receivable.

We conclude that summary judgment should not have been granted on this count. We have instructed judges to provide a fair opportunity for response before allowing a motion for summary judgment on counts where summary judgment has not been requested. *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291, 295 (1983) ("In the circumstances we assume that the judge had the power, sua sponte, to enter full summary judgment [on a motion for partial summary judgment], provided that the parties had sufficient notice of his intention to do so, opportunity to submit affidavits, and a right to be heard on the matter"). See *Quincy* v. *Massachusetts Water Resources Authy.*, 421 Mass. 463, 471 (1995); *Monaco* v. *Lombard Bros., Inc.*, 24 Mass. App. Ct. 941, 941-942 (1987) (reversing judgment where judge granted motion for summary judgment on ground not raised by either party, without giving parties opportunity to address question). The record, albeit incomplete, raises questions about whether appropriate procedures were followed here. Furthermore, there are numerous facts in dispute regarding the Agreement, the course of extensive dealings between the different parties, and their motivations. Also, given the overlapping responsibilities of the different actors, including Perez, who was the president of MedTeam as well as the president and chief executive officer of BRMC, a trial will be necessary to resolve in which capacity various people were acting, and for whose benefit, when they made certain decisions.

In deciding that summary judgment was not appropriate, we nonetheless recognize that the standard for proving tortious interference against [BRMC] is a high one. "Claims of

intentional interference with contractual or advantageous relations require a showing that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract . . . , resulting in damage." *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 652 (2003). See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 812 (1990). Furthermore, as we stated in *Williams* v. *B & K Med. Sys., Inc.*, 49 Mass. App. Ct. 563, 576 (2000), "related companies are allowed considerable latitude to interfere in the contractual relations of each other." Nonetheless, it is premature to conclude that the plaintiff will be unable to prove tortious interference by BRMC in the instant case. The plaintiff has presented evidence that raises genuine issues of material fact about improper means (whether BRMC deducted revenues knowing such deductions were disallowed) and improper motives (whether BRMC sought to remove the plaintiff and take for itself the profitable Fertility Center and its outstanding receivables).[18] See *Melo-Tone Vend-*

---

[18]We recognize that summary judgment was previously granted on Count VII of the complaint: "Malicious Interference with Contract — Cardone vs. Atlantic" and Count IX of the complaint: "Malicious Interference with Contract — Cardone vs. Perez." After a Superior Court judge had allowed a separate and final judgment pursuant to Mass.R.Civ.P. 54(b) on these and other counts, a different panel of this court affirmed both rulings. That panel, in an unpublished decision, *Cardone* v. *Perez*, 57 Mass. App. Ct. 1103 (2003), concluded that summary judgment was appropriate on Count VII because "[a]part from the plaintiff's conclusory assertion in his complaint of wrongful interference and some evidence that Atlantic may have voted to discontinue MedTeam's management practice services, the plaintiff produced no evidence that Atlantic was motivated by an improper motive or used improper means." BRMC, in contrast to Atlantic, was not so far removed from decision-making. In regard to Count IX, that panel concluded that summary judgment was appropriate because Perez acted in his capacity as a corporate officer, and because the record did not raise a genuine issue that Perez acted with "a spiteful, malignant purpose, unrelated to a legitimate corporate interest." Because Perez was a corporate officer of MedTeam as well as BRMC, he stands in a different posture from BRMC, at least when he is acting as a corporate officer of MedTeam regarding internal MedTeam employment matters. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981) (actual malice standard applies when employee sues supervisor for tortious interference with contract); *Boothby* v. *Textron, Inc.*, 414 Mass. 468, 487 (1993). It is also not clear, in Count IX, in what capacity Perez was sued, as the plaintiff does not address the issue. Finally, the record before the panel in that appeal appears to differ somewhat from the one presented in this appeal. Record changes like this, and the other potential problems of piecemeal review presented here, exemplify

*ing, Inc.* v. *Sherry, Inc.*, 39 Mass. App. Ct. 315, 316 (1995) (emphasizing that use of improper means or improper motive is necessary element of tortious interference with contract).

2. *Motion to compel production of documents.* Dr. Cardone appeals the denial of his motion to compel production of the Fertility Center's patient records. The defendants objected to the plaintiff's motion to compel on the ground that providing such information would violate the privacy and confidentiality interests of the patients. BRMC also rejected the plaintiff's proposed "Confidentiality Agreement," drafted to "assuage BRMC's concern for patient confidentiality." A Superior Court judge denied the plaintiff's motion, with the exception of "aged accounts." The defendants produced all documents responsive to the court's order. The plaintiff's renewed motion to compel was also denied.

"The conduct and scope of discovery is within the sound discretion of the judge." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987). See *Bishop* v. *Klein*, 380 Mass. 285, 288 (1980); *Symmons* v. *O'Keeffe*, 419 Mass. 288, 302 (1995); *Buster* v. *George W. Moore, Inc.*, 438 Mass. at 653. Dr. Cardone must show that the denial of his motion to compel constituted such an abuse of discretion. A single justice of this court denied the plaintiff's petition for relief, stating, "[t]he management of discovery is quintessentially the business of the trial judge." See *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 485 (2000) (appellate courts accord great deference to discovery rulings of trial judges). Further, the single justice stated, "[t]he Superior Court judge's limitations on discovery are consistent with concern for the patients' rights of privacy." See *Alberts* v. *Devine*, 395 Mass. 59, 68, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985) ("all physicians owe their patients a duty, for violation of which the law provides a remedy, not to disclose without the patient's consent medical information about

why rule 54(b) certification is considered "a special dispensation" to be "exercised sparingly." *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 389 (2000), quoting from *Harriscom Svenska AB* v. *Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991), and *Feinstein* v. *Resolution Trust Corp.*, 942 F.2d 34, 39 (1st Cir. 1991). We consider the balkanization of the appeal of this case to be unfortunate. See note 3, *supra*.

the patient, except to meet a serious danger to the patient or others").

Dr. Cardone sought production of documents relating to patients whom he may not have treated. Dr. Cardone was not entirely denied access to patient records. The Superior Court judge allowed limited discovery under circumstances that would not violate patient confidentiality. As we determine there was no abuse of discretion, we affirm the order of the trial court. See *Beaupre* v. *Cliff Smith & Assocs.*, *supra* at 485.

3. *Conclusion.* The separate and final judgment as to Counts II and VI is reversed, and the matter is remanded to the Superior Court. The order denying the plaintiff's motion to compel production of documents is affirmed.

*So ordered.*