Rubin, J.
(dissenting). Viewing the evidence in the light most favorable to the plaintiff, which operated a restaurant in commercial space in The Village at Ford Pond Condominium, the defendant trustees of The Village at Forge Pond Condominium Trust *358 (trust) knowingly made it impossible for the plaintiff s landlord to perform its contractual obligation to provide a certain number of nonexclusive use parking spaces to the plaintiff for use of its patrons. The majority holds that reducing the number of nonexclusive use spaces by assigning them for a third party’s exclusive use — excluding patrons from using them — was not a breach of the lease. Because the majority’s affirmance on this ground rests upon a reading of the contract between the plaintiff and its landlord that renders an important bargained-for provision concerning parking available to the restaurant’s customers essentially meaningless — a reading not advanced even by the trust — it is incorrect. Because the majority improperly denies the plaintiff its day in court, I respectfully dissent.
Background. Viewing the summary judgment record in the fight most favorable to the nonmovant plaintiff, a finder of fact could find the following: The plaintiff JNM Hospitality, Inc. (JNM), operated Centerfields Bar and Grill (Centerfields) in space it leased in The Village at Forge Pond Condominium in Canton, which contains both residences and 8,000 square feet of commercial space. JNM’s landlord, Canton Viaduct, LLC (Canton Viaduct), was the assignee of the owner of two of the five commercial units in the condominium, which were combined to form the premises leased to JNM.
Adequate parking was essential to the success of the restaurant. According to a decision of the zoning board of appeals of Canton dated June 14, 2001, the condominium was required to have one parking space for each of the fifty-nine residential units as well as one parking space for each 250 square feet of the 8,000 total square feet of commercial space, or thirty-two additional spaces, for a total of ninety-one parking spaces. The condominium had these spaces.
Of the ninety-one spaces, Canton Viaduct had eleven parking spaces immediately in front of the entrance to the restaurant, designated for the exclusive use of Canton Viaduct’s tenant. Another eight of the spaces were owned appurtenant to specific units and were designated for the exclusive use of those units. Six spaces were at the end of a dirt road and were unusable.
It thus appears that there were sixty-six remaining usable spaces at the condominium that were not designated for any owner’s or tenant’s exclusive use. Under the master deed of the condominium, unit owners, including the landlord, were entitled *359 to the nonexclusive use of these common parking spaces.[1] These shared or common parking spaces were available for the use of condominium owners on a first-come, first-served basis.
a. The lease. JNM and Canton Viaduct entered into a lease agreement[2] that addressed, inter alia, parking spaces. A draft lease was sent by Canton Viaduct to counsel for JNM. That counsel made handwritten changes on the documents. Those changes were initialed by both parties, and the contract was signed.
Paragraph 2 of the agreement includes language related to parking. It provides that “[notwithstanding the common use of the parking facilities, Tenant shall have the exclusive use of the eleven (11) parking spaces marked on Exhibit A [to the lease].... Based on 2,600 square feet, the number of spaces to be provided is eleven (11) spaces as required by Canton Zoning Regulations.”[3]
The parties disagree as to whether the first clause of this provision conveyed to JNM the landlord’s right to the nonexclusive use of the common parking spaces that it held as part of its ownership of the leased condominium units, or only the eleven exclusive-use spaces. It does the former — and I note that the motion judge’s grant of summary judgment was based entirely on his erroneous conclusion to the contrary.
Immediately after what is now the concluding clause of the *360 parking provision, “Tenant shall have the exclusive use of the eleven (11) parking spaces marked on Exhibit A,” the initial draft included another phrase that was struck by counsel for JNM, a deletion initialed by both parties. It read, “but shall have no right to use of any other parking spaces located on the premises and landlord shall provide Tenant with one space per 250 square feet (excluding basement space).” Had this language not been struck, the contract would have meant that JNM had the right to use only the eleven exclusive-use spaces. That it was struck indicates the parties intended that JNM would be able to use the nonexclusive spaces.
The judge below reached the opposite conclusion by accepting the trust’s substitution, in its rendering of the deleted phrase, of the word “[the],” which it placed in brackets, for the word “no.” In the trust’s rendition, the crossed-out phrase read “shall have [the] right” to use common parking spaces, rather than “shall have no right” to use the common spaces.
The judge recognized that the word in the stricken phrase is not “the.” He wrote, “in the copy of the lease in the summary judgment record, it is difficult to make out the word for which the [trust] has substituted the word ‘the.’ ”
We have the same copy of the lease before us. To be sure, there are artifacts of photocopying that partially obscure the word. Nonetheless, the judge seemed to recognize what is obviously true from examining the document, it is a two-letter word. The judge suggested that the word might be “an,” but that is obviously incorrect and, as the judge observed, that would also be “ungrammatical.” The judge further observed that the original word “might also be ‘no,’ which would rather dramatically change the meaning of that portion of the stricken language.” The judge, however, concluded that the word “no” “would be inconsistent with the text of the provision as a whole.”
An exantination of the document makes clear, however, that the word is, fairly obviously, “no.” It certainly does dramatically change the meaning of the stricken language from what the judge read it to mean.
But it is not inconsistent with the text of the provision as a whole. Indeed, it essentially resolves any ambiguity in paragraph 2, and makes clear that the meaning of the text of the provision as a whole is the opposite of what the judge concluded.
The judge wrote, “I accept the substitution of the word ‘the’ as accurate, because [p]laintiff did not disagree with it in its own *361 brief, nor did [pjlaintiff object when counsel for the [trust] used the word ‘the’ when he read that stricken language at oral argument. Counsel for Canton Viaduct, the other party to the [l]ease, was also present at oral argument, and similarly made no comment when counsel for the [trust] used the word ‘the.’ ”
A judge may not accept a word as “accurate” when it obviously is not, at least when it comes to the reading of a legally operative text. Indeed, even if a party could waive a claim about what in fact the words in a document in the record are, there was nothing rising to the level of waiver (for example, a failure to object to the admission of evidence) in what JNM did. The lease thus conveyed to JNM the landlord’s right to the nonexclusive use of the common parking spaces.
b. The USPS agreement. Following the signing of the lease agreement, the restaurant opened. The restaurant operated continually between March, 2003, and January 1, 2013, when it closed down.
The restaurant operated successfully for many years. In May, 2010,[4] the trust entered into a license agreement with the United States Postal Service (the USPS agreement), which maintained a facility adjacent to the parking area of the condominium. The USPS agreement allowed USPS to park its vehicles in fifteen of the nonexclusive use spaces. In exchange for this, USPS agreed to pay the trust $936 dollars per month. One of the trust’s reasons for entering into the USPS agreement was to make money in order not to raise condominium fees. There was also evidence that certain unit owners harassed Centerfields by, among other things, pouring buckets of water onto patrons from a balcony above the restaurant’s deck, videotaping patrons from a window above the restaurant’s entrance, and making repeated telephone calls to the restaurant threatening to call the police about the noise.
Business at Centerfields was steady until the USPS agreement went into effect, when it declined sharply. JNM provided an affidavit from a former general manager of the restaurant attesting to the fact that “[s]ince the [p]ost [o]ffice has been allowed to park in the [c]ondominium lot, our lunch trade and [e]arly [b]ird dinner trade has been reduced to the point that it is almost completely gone. The restaurant used to do a thriving lunch and [e]arly *362 [b]ird dinner business and now the restaurant is nearly empty at those times.”
JNM also provided an affidavit from a former bartender attesting to the fact that ‘“[sjince the post office employees ha[d] been parking in the [condominium parking lot” customers had been complaining constantly about the lack of parking, and the restaurant had lost sixty to seventy percent of its lunch customers and seventy-five to eighty percent of its early bird diners. An affidavit from JNM’s accountant stated that ‘“[djuring 2010 and through 2012 the sales declined sharply and steadily through the [three]year period .... [T]he continued decrease in sales [was] not consistent with the last [fourteen] years of operation.”
Viewing the summary judgment record in the light most favorable to JNM, the USPS use of the spaces reduced dramatically the number of nonexclusive use spaces available to JNM. In addition, the placement of USPS trucks also blocked its use of the eleven exclusive use parking spaces. And, as a consequence, JNM’s business suffered and ultimately failed.
Discussion. ‘“In an action for intentional interference with contractual relations, the plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). The second prong may be satisfied not only by a showing that the defendant induced the third party to break the contract, but by a showing that its actions knowingly made it impossible for the third party to perform its contract. See Restatement (Second) of Torts § 766 & comment h (1979); Cardone v. Boston Regional Med. Center, Inc., 60 Mass. App. Ct. 179, 188-191 (2003) (reversing grant of summary judgment on intentional interference claim and holding that there was genuine issue of material fact whether defendant used improper means when it knowingly violated contract to compensate third party, which then breached its contract to compensate plaintiff). See also Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 619 (2014) (second prong undisputedly satisfied when Google exercised rights under its contract with Motorola to prevent Motorola from shipping devices containing plaintiff’s software, causing Motorola to withdraw from its contract with plaintiff to include plaintiff’s software on its devices).
*363 a. Did the trust’s actions knowingly make it impossible for the landlord to perform its contractual obligation with respect to parking? There is sufficient evidence in the summary judgment record to support a finding that the trust’s agreement with USPS made it impossible for the landlord to perform its obligation under the lease, and that, since the trust has not argued that it did not know of the lease, that interference was knowing.
The motion judge concluded that although JNM had evidence that could satisfy the first of the tort’s elements, there was insufficient evidence to satisfy the second. The basis for this conclusion was the motion judge’s construction of the contract reading it to be limited to providing only eleven exclusive use parking spaces to JNM. Without addressing the evidence that even the use of these eleven spaces was compromised because of the USPS agreement — evidence that, the trust argues, by itself might require reversal of summary judgment to the extent JNM’s claim relies on interference with its right to use those spaces — the judge concluded that, because JNM had no entitlement under the lease to use whatever common parking spaces were available, JNM would be unable to show that the landlord was unable to fulfil the terms of the lease because of the trust’s actions.
Both the lead opinion and the concurrence take another tack, concluding that because the spaces given to USPS by the trust were for the “nonexclusive use” of the unit owners and their lessees, the trust’s action reducing the number of those spaces did not interfere with Canton Viaduct’s performance under the contract.
Not even the trust makes this argument, and for good reason. The linchpin of the majority’s argument is that “[t]he lease contains no provision that precludes ... the trust from providing similar access to nonexclusive spaces to . . . third parties.” Ante at 354. Under this reading, JNM, a commercial party planning to operate a restaurant, in seeking a contractual right to use the “nonexclusive use” spaces bargained for what amounts to a meaningless term. Under the contract as so construed, nonexclusive-use spaces that would once have been available only to the restaurant and other tenants of the condominium on an equal footing may be rented out to a third party, reducing the availability of those spaces for restaurant patrons, and there will be no violation of the contract. That is obviously wrong.
The majority concludes that the lease does not guarantee or entitle JNM to use any specified number of nonexclusive use *364 spaces. But there is, in fact, evidence in the summary judgment record that would support a finding by a jury that it was unlawful for the trust to license these spaces to USPS. The trust reduced the number of available parking spaces for occupants of the condominium to a number below what was required both by zoning by-law and for approval of the site plan and issuance of a special permit for the development by the zoning board of appeals. In bargaining for its lease, JNM was entitled to rely upon these limitations on reducing the number of nonexclusive use spaces for which its patrons were entitled to compete. They need not have been contained in the lease for the trust’s agreement with USPS to render impossible Canton Viaduct’s performance of its contractual obligation to make the legally required number of nonexclusive use spaces available. Consequently, the summary judgment should be reversed.
b. Other grounds for affirmance. The third and fourth elements of tortious interference with contractual relations appropriately remained unaddressed by the judge below, and the trust has not argued for affirmance on these alternative grounds. Nonetheless, because the lead opinion addresses those elements, I do so as well.[5]
The third element requires either improper “means” or an improper “motive.” “[T]he plaintiff need not prove both.” Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006).
As to means, the evidence that the agreement with USPS reduced the number of available parking spaces to a number below what was required both by zoning by-law and for approval of the site plan and issuance of a special permit for the development suffices to raise a genuine issue of material fact on this jury question.
I disagree that in order to prove improper means there must be some “actual reprehensible conduct” distinct from any violation of a statute or regulation. Ante at 356. We have held that “[i]m-proper means include violation of a statute or common-law precept.” Cavicchi, supra. To be sure, “even when there is a violation of statute or common-law rule, there must be a case-by-case evaluation,” and “not every such violation constitutes improper means.” KACT, Inc. v. Rubin, 62 Mass. App. Ct. 689, 699 (2004). Thus, in KACT, Inc., supra at 700, a violation of *365 condominium documents and thus G. L. c. 183A by condominium trustees in proposing rules and regulations for operation of a restaurant was held not to amount to improper means “at least as to the plaintiffs” where the plaintiffs, through acquiescence over many years, “had waived any violation of the statute, as well as any violation of the provisions of the master deed and bylaws.”
But the evidence on the question of impropriety in this case is at least sufficient to go to a jury. Indeed, to reach the opposite conclusion, we would have to hold that the trust might have leased out the entire parking lot to a third party in violation of the zoning by-law, depriving the great majority of the tenants in the condominium of any place to park, and that none might have redress for this interference with his or her lease because, as a matter of law, the trust did not use “improper means.”
As to “motive,” a genuine issue of material fact exists because the record evidence shows that although the trust could revoke the USPS agreement at will, it took no action even after JNM informed the trust in June of 2011 that the lack of parking was hurting its business and that the USPS agreement violated the special permit.[6]
As for the fourth element, there is in the record sufficient evidence that JNM was harmed by the trust’s actions that the question must go to a jury. Drawing every reasonable inference in favor of JNM, the evidence supports a conclusion that the parking situation was far worse after the trust entered its agreement with USPS. Whether the loss of nonexclusive use spaces harmed JNM is a quintessential jury question. If we view the evidence as we must, in the light most favorable to JNM, we cannot resolve it in the trust’s favor.
Conclusion. Because the trust’s motion for summary judgment should not have been allowed, I respectfully dissent.

 I say it “appears” there were sixty-six usable common parking spaces because there is some confusing evidence suggesting that there may have been some “residents only” spaces that may not properly be counted as common spaces to which JNM and its customers had access. The precise number of shared or common parking spaces is immaterial, since this case is about the diminution in the number of spaces rather than the absolute number available.

 The lease document lists the landlord as “Forge Pond, LLC.” The parties, however, have agreed that JNM is the tenant of Canton Viaduct under this lease. JNM alleges in the complaint, and the trust agrees in its brief, that the lease was assigned by Forge Pond, LLC, to Canton Viaduct. Neither party argues that this assignment is material to the suit. Thus, for the purposes of this opinion, I treat JNM and Canton Viaduct as though they were the original parties to the lease.

 Paragraph 8 of the agreement states, “Tenant’s use and operation may under no circumstances interfere with the quiet use and enjoyment of other tenants in the buildings and Tenant specifically agrees . . . that employees and patrons shall not park vehicles in any area of the property.” Read literally, this would mean that JNM was not entitled to use any parking spaces as part of the lease agreement, but was expressly forbidden from doing so. The trust, however, concedes that the eleven exclusive spaces referred to in paragraph 2 were bargained for, and presses no argument that paragraph 8 means that JNM was not entitled to use whatever parking was provided for by paragraph 2. Consequently, I need not address paragraph 8 further.

 Although the text of the agreement states that it was entered into on May 1, 2010, the last page, headed “Acceptance by the Postal Service,” was manually signed and dated December 14, 2010. However, the parties appear to agree that the trust entered into the agreement with USPS “on or about May 1, 2010.”

 The concurring opinion would not reach and does not address these elements.

 There is also evidence in the summary judgment record that some condominium residents objected to Centerfields’s presence, and that may have engendered ill will towards Centerfields among the trustees. See Adcom Prods., Inc. v. Konica Bus. Machs. USA. Inc., 41 Mass. App. Ct. 101, 105 (1996) (motive of retaliation or ill will is improper).