NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1236                                           Appeals Court

SKYHOOK WIRELESS, INC. <u>vs</u>. GOOGLE INC.

No. 13-P-1236.

Suffolk.     May 9, 2014. - November 6, 2014.

Present: Kantrowitz, Cohen, & Agnes, JJ.

<u>Contract</u>, Interference with contractual relations, Implied
     covenant of good faith and fair dealing. <u>Unlawful
     Interference</u>. <u>Practice, Civil</u>, Summary judgment, Consumer
     protection case. <u>Malice</u>. <u>Consumer Protection Act</u>, Unfair
     act or practice.

<u>Civil action</u> commenced in the Superior Court Department on
September 15, 2010.

The case was heard by <u>Judith Fabricant</u>, J., on a motion for
summary judgment.

<u>Glenn K. Vanzura</u>, of California (<u>Scott McConchie</u> with him)
for the plaintiff.
     <u>Jonathan M. Albano</u> (<u>Susan Baker Manning</u>, of the District of
Columbia, with him) for the defendant.

COHEN, J.  After mobile electronic device manufacturers

Motorola, Inc. (Motorola), and Samsung Electronics Co., Ltd.

(Samsung), withdrew from business deals with software developer

Skyhook Wireless, Inc. (Skyhook), Skyhook filed a complaint against the defendant, Google Inc. (Google), alleging intentional interference with Skyhook's contract with Motorola, intentional interference with Skyhook's advantageous business relations with both Motorola and Samsung, and violations of G. L. c. 93A.[1]  A judge of the Superior Court granted Google's motion for summary judgment on all counts.[2]  We affirm.

Background.[3]  Consistent with summary judgment standards, the facts upon which we rely are either undisputed or taken in the light most favorable to Skyhook.  See Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 777 (2013).[4]

---

[1] Google later acquired Motorola, but at all times relevant to this case, Google and Motorola were separate, independent corporations.

[2] The same judge previously had denied Skyhook's motion for a preliminary injunction.

[3] The judge's comprehensive thirty-five page decision contains an extremely detailed account of the events leading up to this dispute and the technological issues that lie at the heart of it.  For present purposes, we summarize the essential facts needed to frame the issues on appeal.

[4] Many of the materials before us in this appeal are governed by impoundment orders issued by the Superior Court, beginning with a "stipulated protective order for litigation and involving patents, highly sensitive confidential information and/or trade secrets."  Because some of the facts recited in this opinion are drawn from a volume of the joint record appendix labeled by the parties as including impounded material, before publication of the opinion we solicited letters from the parties (and an interested nonparty) as to whether and why they contended that any of those specific facts should be subject to continuing impoundment.  The letters disavowed any need for

This case arises from the aborted plans of Motorola and Samsung, manufacturers of mobile electronic devices (including so-called "smart phones"), to license and install Skyhook's software product, XPS, to provide location services on their "Android" mobile devices (described below).  Location services identify where the mobile device is physically positioned.  Alone and in conjunction with other software applications, they allow the device user to find his or her location, to identify the location of nearby facilities, and to receive marketing information about commercial establishments in the vicinity.  Location systems also collect location data from the device and return that data to the software provider for inclusion in its location database.  The data then can be used to improve the accuracy of location results, as well as for commercial purposes.

Android is a mobile device operating system developed and maintained by Google.  It is an "open source" operating system, meaning that it is publicly available and can be used without charge; however, Google owns and controls the use of the Android trademark and related trademarks, as well as the use of a group

---

impoundment of the identified facts, and we vacated the Superior Court impoundment orders to the limited extent necessary to allow public dissemination of those facts.  See Rule 7 of the Uniform Rules on Impoundment Procedure (1986); S.J.C. Rule 1:15, as appearing in 401 Mass. 1301 (1988); Adams v. Adams, 459 Mass. 361, 362 n.1 (2011).

of proprietary mobile services applications known as Google Mobile Services (GMS) Apps. Google requires, by contract, that devices marketed under Android trademarks and including GMS Apps meet Google's compatibility standards, which are set out in detail in the Android Compatibility Definition Document (CDD) published by Google.[5]

In addition to a number of well-known software applications (e.g., Gmail, Google Maps, Google Search, and YouTube), GMS Apps include an application known as Network Location Provider (NLP), which helps to supply Google's location services to mobile devices. In part, NLP works in conjunction with two application programming interfaces (APIs) that are part of the Android operating system:[6] the GPS Provider API, which determines a device's location using the United States government's Global Positioning System (GPS) satellites; and the Network Provider API, which determines location based both on triangulation from nearby cellular communications towers (cell towers) and on the device's detection of local wireless network access points ("Wi-

---

[5] Because a device's Android compatibility gives its user access to over 400,000 applications developed by third parties (through Google's "Android Market" application), compatibility is also vital to device marketability.

[6] An API is an interface that enables a software program to interact with other software and describes the ways in which particular tasks are performed.

Fi" networks).[7,8]  Google's Software Development Kit (SDK), which assists third-party developers in creating new applications for use on any Android-compatible device, specifically informs developers which kinds of data are used by the GPS Provider API

---

[7] "Wi-Fi" may be understood as follows:

> "Wi-Fi refers to wireless local area networks, or WLANs, which connect users to the Internet by means of radio or infrared frequencies.  These networks require the network operator to install a short-range radio tower, referred to as a wireless access point ('WAP'), which sends and receives data to and from user devices that are equipped with hardware capable of receiving the signal from the access point.

> ". . .

> "Wi-Fi networks may be implemented by a variety of operators and in a variety of contexts.  Private residences and businesses deploy wireless networks for use in the home or office.  Other businesses directly provide wireless networks in public areas such as airports, coffee shops, hotels, and convention centers.  Collectively, these networks create 'hotspots' in suburban areas and business districts, which provide wireless access to the public.  Beyond hotspots, several municipalities currently offer or have begun to explore plans to provide public Wi-Fi access."  (Footnotes omitted.)

Bierlein, Policing the Wireless World:  Access Liability in the Open Wi-Fi Era, 67 Ohio St. L.J. 1123, 1128-1129 (2006).

[8] As the judge described the three location technologies,

> "GPS is the most accurate of the three, but can be slow, and does not work well in dense, populated areas, or indoors.  Cellular tower triangulation is less accurate, but works well indoors and outdoors.  The [W]i-[F]i method draws on a manually-compiled database of [W]i-[F]i access points in populated areas; it transmits data from those points to the software maker's location database, and then translates the data into latitude and longitude coordinates."

(satellite) and Network Provider API (cell tower and Wi-Fi) to fix location. The SDK is incorporated in the CDD by reference, and plays a role in determining whether Google's compatibility standards are met.

Like Google's NLP, Skyhook's XPS also determines the location of a mobile device by collecting information from GPS satellites, cell towers, and Wi-Fi networks. However, XPS operates by integrating the location data received from these three different sources. Through this approach, XPS achieves greater speed in reporting a location result. Another difference between the Google and Skyhook systems is that, unlike Skyhook's XPS, Google's NLP includes "reverse geocoding" functionality, which converts longitude and latitude coordinates to street addresses and place names.

In supplying location services software to mobile device manufacturers, both Google and Skyhook expect and require that they will be able to collect location information from the mobile devices on which the software is installed. Thus, when enabled on an Android device and subject to the user's consent, NLP collects "network data" for Google, i.e., information about nearby Wi-Fi networks and cell towers. XPS likewise collects such information for Skyhook. Both companies consider this retrieval of network data, and the accuracy of the data, to be

essential to the location databases they maintain as part of their business models.

In April and June of 2009, respectively, Samsung and Motorola entered into contracts with Google allowing them to use the Android trademarks and to preload specified GMS Apps, including NLP,[9] on their mobile devices. The contracts did not specify that Google would be the exclusive provider of location services software for the manufacturers' Android devices. However, the contracts did require the devices to meet Google's Android compatibility standards,[10] and also required the manufacturers to "accurately reproduce" the GMS Apps on the

---

[9] Samsung's contract with Google specified NLP by an amendment in December, 2009.

[10] Samsung's contract with Google stated in part, "The license to distribute Google Applications . . . is contingent upon the device becoming an Android Compatible Device." The term "'Android Compatible Device(s)' means Device(s) that (i): comply with the [CDD] . . . and (ii) successfully pass the Android Compatibility Test Suite (CTS)." The CTS is a set of automated tests developed by Google to determine if a device has any known potential incompatibilities. It is undisputed that both Motorola's and Samsung's devices containing Skyhook's location services passed the CTS.

Motorola's contract with Google in part provided that "[t]he license to distribute Google Applications . . . is contingent upon Motorola certifying that the Device passes the [CTS] and conforms to the [CDD]." We reject Skyhook's contention that this provision, requiring Motorola to give its certification as to conformity with the CDD, means that Google may not withhold its written approval of a device based on its own determination of a lack of conformity. See notes 11 & 14, infra, and accompanying text.

devices.  Under the contracts, the ultimate distribution of the devices was subject to Google's prior written approval.[11]

Thereafter, unbeknownst to Google, both Motorola and Samsung entered into contracts with Skyhook.  In September, 2009, Motorola entered into a licensing and distribution agreement with Skyhook by which Motorola agreed to preload XPS on its Android devices, subject to an exception for devices "where Motorola is contractually prohibited by a qualified third party."  The contract defined "qualified third party" to include "a certifying entity which has the right to define and approve the technical specifications required to be a[n] Android-compliant device and which has declared the Embedded Software to be non-compliant."  The Motorola-Skyhook contract also provided that Motorola would not authorize or enable any other party to use XPS or Motorola's devices to collect location data. Subsequently, in May, 2010, Samsung also entered into a

---

[11] For example, the following provisions appear in Motorola's contract with Google:  "The pre-loading of a Device with Google Applications in each individual Territory shall be subject to Google's prior written approval, which shall not be unreasonably withheld or delayed"; "The distribution of each of . . . the Google Applications shall be subject to Google's prior written approval (not to be unreasonably withheld or delayed) to ensure adherence to the terms and conditions of this Agreement . . ."; "Google must provide terminal acceptance of a Device in writing before initial distribution of the Device in each individual Territory"; and "For the avoidance of doubt, each new Territory, each new Device, and each new Telecom Operator in each Territory needs to be approved by Google prior to Launch." Samsung's contract with Google includes similar language.

licensing agreement with Skyhook, but on a different basis. Pursuant to its contract with Skyhook, Samsung agreed to pay a guaranteed minimum for the right to install XPS on its Android mobile devices. However, Samsung was not obligated to do so.

After the execution of the Motorola-Skyhook contract, there was considerable discussion within and between these two companies as to whether XPS was Android-compatible. This discussion was prompted by the fact that XPS was configured to report "hybrid" location data -- information derived not only from GPS satellites, but from the network data obtained using cell towers and Wi-Fi networks -- through Google's GPS Provider API, which was described in Google's SDK as delivering satellite data alone. Both companies pondered whether XPS would violate Android compliance by giving the incorrect impression that the reported location results came from GPS satellite sources and met the high level of accuracy that users and independent application developers expected from satellite data.[12]

---

[12] For example, in February, 2010, Motorola employees stated that XPS "is absolutely a horrible user experience for location," that Motorola "will be in violation of Android Compliance if we ship like this and may have stop ship issue on our hands," and that "Skyhook is the poster child for making changes to the [Android] platform the wrong way." On February 19, 2010, a Skyhook employee stated in an internal electronic mail message (e-mail) that "reporting cell locations as GPS locations is just too confusing for an app[lication]." The next day, in an internal e-mail discussing various concerns with the XPS implementation, a Motorola employee wrote: "Skyhook is evaluating the time and effort needed to change XPS to only

Google remained unaware of Motorola's contract with Skyhook until April 26, 2010, when, without Motorola's contractually required approval, Skyhook released a press briefing entitled "Motorola to replace Google with Skyhook," and stating in part that "Motorola is the first Android device maker to abandon Google for its location services." Google employees immediately began to discuss this development and its implications, including the risk that other device manufacturers would switch to Skyhook and Google would suffer a loss in the "ability to continue collecting data to maintain and improve [its] location database."

Soon thereafter, on May 7, 2010, representatives of Google and Motorola met to discuss Motorola's use of XPS to provide location services. At this meeting, Google employees raised the same hybrid location reporting issue that Motorola and Skyhook had been discussing.[13] A few weeks later, Google informed

---

return GPS results if the application makes a direct location request to the GPS Location Provider API, and will provide their estimate on Monday. In parallel, Motorola needs to determine if we feel that the current approach creates a compliance issue or whether the current XPS implementation is acceptable since it provides a location result using GPS, WiFi, and CellID information."

[13] Specifically, Google voiced concern that XPS's use of the Android operating system's GPS Provider API, rather than the Network Provider API, to report location based on Wi-Fi and cellular data would reduce the accuracy of the information collected by Google and stored in its database about Wi-Fi access point and cell tower locations. Google described this

Motorola that, due to this reporting issue, Motorola's implementation of XPS would fail to meet Android compatibility requirements. Nevertheless, Google emphasized that if Motorola could implement Skyhook in a way that resolved the reporting issue, then "by all means let's do it."

At the same May 7 meeting, Google identified another issue with XPS -- its inability to convert longitude and latitude coordinates to street addresses and place names. Motorola could not effectively market its devices without this reverse geocoding function, and, as the issue developed over the next few weeks, it became apparent that Motorola also would need to rely on Google's competing product, NLP, in order to provide for reverse geocoding. Skyhook acknowledged that Motorola's use of NLP was the only available option, but would agree to its use only if Motorola altered NLP to block its collection of competitive location data for Google.

Motorola and Skyhook began communicating with each other about both the hybrid location reporting issue and the data collection issue. On May 28, 2010, with these issues still unresolved, Google instructed Motorola not to ship its devices with XPS. Motorola complied and removed XPS from devices being

reporting problem as "contaminating" Google's location database. Google also voiced concern that XPS's misreporting of network data as GPS data would adversely affect applications created by third-party developers in reliance on the accuracy of location data reported through the GPS Provider API.

prepared for shipment in July. A few days later, on June 4, Skyhook submitted to Motorola revised software that was intended to fix the hybrid location reporting issue. Subsequently, Google made it clear to Motorola that it was free to include XPS, as long as the revised software did not deviate from Google's compatibility standards by returning non-satellite data through the GPS Provider API.

The data collection issue remained an active concern, however. Google remained steadfast that, under its contract with Motorola, Motorola was required to include the applications it licensed from Google (including NLP and other applications that collected location data) in their entirety -- and without neutering their data collection function. Skyhook, for its part, insisted that its contract with Motorola gave it the right to block Google from collecting location data on Motorola devices, and that the data collection function on Google applications would have to be disabled. Faced with these conflicting demands, Motorola eventually notified Skyhook that it was terminating their agreement.

As for Samsung, in March, 2010, and entirely independent of any input from Google, Samsung began to express concerns to Skyhook about the cost of XPS. Several months later, in June, 2010, Google first discovered that Samsung had contracted with Skyhook and that Samsung already had begun shipping some devices

containing XPS.  Google informed Samsung of the same hybrid location reporting issue it had raised with Motorola, stating that it "cannot approve the current implementation as-is."  On July 10, Samsung notified Skyhook that it was not going to use XPS because "Google Locator was good enough in [the United States] region and [the] financial burden from Skyhook was another reason."

On September 15, 2010, Skyhook filed the present action, claiming that Google had, with improper motive or means, intentionally interfered with its contract with Motorola and with its advantageous business relations with both Motorola and Samsung, and that those acts constituted violations of G. L. c. 93A.  Google moved for summary judgment, and the judge ruled in its favor.  On the interference claims, the judge reasoned that the evidence did not support a finding of improper motive or means.  On the c. 93A claim, the judge ruled that no reasonable jury could conclude that the conduct at issue occurred "primarily and substantially in Massachusetts" as required by c. 93A, § 11.

2.  Discussion.  a.  Standard of review.  We review the grant of summary judgment de novo to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, . . . the moving party is entitled to a judgment as a matter of law."  Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass.

50, 54 (2012), quoting from Juliano v. Simpson, 461 Mass. 527, 529-530 (2012). See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711-712 (1991). While our review is de novo, we have the benefit of the motion judge's thorough and thoughtful decision. After independently considering the record and the applicable law, we reach the same conclusions.

b. Interference claims. To establish a claim of intentional interference with contractual relations, the plaintiff must prove that: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990). Similarly, to establish a claim for interference with advantageous business relations, the plaintiff must prove that "(1) [the plaintiff] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Blackstone v.

Cashman, 448 Mass. 255, 260 (2007). It is undisputed that Skyhook has established the first two elements of each claim. As to the third element, although Google does not concede that its actions constituted interference, we need not confront that issue because, like the motion judge, we conclude that Skyhook's claims founder because Skyhook cannot demonstrate on this record that any interference by Google was improper in either motive or means. We therefore need not reach the fourth element, harm to Skyhook.

In essence, Skyhook's arguments are as follows. As to motive, Skyhook takes the position that a jury should be allowed to decide whether Google's concerns about hybrid location reporting and data collection were a pretext for its true motive, which, according to Skyhook, was to "bully Skyhook out of the market." As to means, Skyhook takes the position that Google unfairly interpreted its contracts with Motorola and Samsung in order to pressure them to abandon their deals with Skyhook. Neither point has merit.

i. Google's contractual rights. We begin with a question of law -- the interpretation of Google's contracts with Motorola and Samsung. Contrary to Skyhook's position, those contracts plainly gave Google the right to hold the manufacturers to

requirements pertaining to compatibility and functionality.[14] With respect to the hybrid location reporting issue, the compatibility standards to which both manufacturers were bound required that, as described in the CDD, "[d]evice implementations MUST NOT omit any managed APIs, alter API interfaces or signatures, [or] deviate from the documented behavior."  In addition, the SDK, which was incorporated into the compatibility standards, informed third-party software developers as to the documented API behavior:  that the GPS Provider API determined location using GPS satellites, while the Network Provider API did so based upon network data.  Because the manner in which XPS reported hybrid location data through

---

[14] Skyhook does not contend that the preexisting contracts between Google and the manufacturers were unlawful.  The gist of its argument is that only the manufacturers, and not Google, had the authority under the contracts to make compatibility determinations; however, this contention is at odds with facts that Skyhook deemed undisputed below, allegations contained in its complaint, the relevant contract language (see notes 10 & 11, supra, and accompanying text), and the course of dealing between Google and the manufacturers.  Google, Motorola, and Samsung all understood Google to have the authority to make compatibility determinations and to provide standards for the conditions under which devices containing its proprietary applications could be shipped.  Furthermore, Skyhook's own contract with Motorola contemplated that Motorola would be excused from preloading XPS, if doing so was "contractually prohibited by a qualified third party," i.e., an entity that "has the contractual right over Motorola to substantially define the features, functions and overall design" of the devices, or "a certifying entity which has the right to define and approve the technical specifications required to be a[n] Android-compliant device and which has declared the Embedded Software to be non-compliant."

the GPS Provider API was in violation of those standards, Google had the contractual right to stop distribution of devices containing XPS as it originally was designed.[15]

With respect to the data collection issue, in order to ship their devices with the Android trademark and Google's proprietary GMS Apps, the manufacturers were contractually obliged to leave the GMS Apps fully functional. When Skyhook conditioned Motorola's use of the revised version of XPS on Motorola's removal of NLP's data collection function, Google was entitled, under its contract with Motorola, to insist upon the "accurate reproduction" of Google applications, including NLP.[16]

ii. _Motive_. We next consider whether, on this record, it reasonably could be found that Google's assertion of its contractual rights was but a smokescreen for its desire to shut Skyhook out of the Android market. We conclude that no such

---

[15] To the extent Google's right to stop shipment was qualified by contract language requiring that its approval not be unreasonably withheld or delayed, see note 11, _supra_, we conclude that on this record no rational jury could find Google's actions or timetable unreasonable.

[16] The "Accurate Reproduction" section of the contract specifies that Motorola "will accurately reproduce the Google Applications . . . and will not insert into the Google Applications . . . other code that is specifically designed to cause the Google Applications to cease operating, or to . . . interfere with any Google Applications or End User data." Installing a stripped-down version of NLP would not have been an "accurate reproduction" and would have "interfered" with the functioning of the application, in violation of this section of the agreement.

finding would be warranted.  The legitimacy of the reporting issue is illustrated by the fact that long before Google even knew that Motorola was going to use XPS, the same problem had been recognized and debated by engineers at both Skyhook and Motorola.  Furthermore, Google never categorically prohibited Motorola's use of XPS.  Google informed Motorola that it had no objection to Motorola's installation of XPS if it could be installed in a compatible way, and, after June 4, 2010, when Skyhook submitted revised software, Google never instructed Motorola not to use the revised XPS.

Likewise, the legitimacy of the data collection issue cannot reasonably be questioned.  Skyhook, no less than Google, considered the collection of network location data to be essential for operational and business reasons.  If anything, Skyhook's criticism of Google's position on data collection seems disingenuous.  Unlike Google, Skyhook insisted upon being the exclusive recipient of location data.  Skyhook also attempted to convince Motorola to disable the data reporting functions on GMS Apps, despite Motorola's valid concerns about its contractual obligations to Google.

Although the record substantiates that, upon learning of the Motorola-Skyhook contract, Google was concerned about losing customers for its own location services and the ensuing harm to its valuable location database, advancing one's own economic

interest, by itself, is not an improper motive.  Pembroke

Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App.

Ct. 34, 39 (2004), citing Hunneman Real Estate Corp. v. Norwood

Realty, Inc., 54 Mass. App. Ct. 416, 428-429 (2002).  Even if,

as Skyhook insists, its location services were superior to

Google's, it was not improper for Google to be motivated, in

part, by competition.  Although Skyhook maintains that

competitive motivation can be proper only if it will advance

better products and services in the marketplace, here the only

parties equipped to decide which product was better for their

needs at that time and under all relevant circumstances were

Motorola and Samsung.

iii.  Means.  "The assertion by a party of its legal rights

is not 'improper means' for purposes of a tortious interference

claim."  Pembroke Country Club, Inc., supra at 40.  See

Restatement (Second) of Torts § 773 (1979).[17]  As previously

---

[17] Section 773 of the Restatement deals with one of several "special situations" in which application of enumerated factors for determining whether interference is improper have produced "clearly identifiable decisional patterns" that warrant a more specific rule.  Restatement (Second) of Torts § 767 comment a (1979).  Section 773 provides that "[o]ne who, by asserting in good faith a legally protected interest of his own . . . intentionally causes a third person not to perform an existing contract . . . does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."  Id. § 773.  The actor's assertion of contractual rights that are in conflict with another's contractual rights is within the scope of this section.  See id. § 773 illus. 3.

discussed, Google had the contractual right to stop shipments of Motorola and Samsung devices unless and until the reporting issue was resolved.  Its exercise of that right did not constitute improper means.  By the same token, Google had the contractual right to insist that its proprietary applications, including their location data collecting functions, would remain intact.  Any economic pressure felt by the manufacturers was simply a product of their preexisting contractual arrangements with Google and their desire to continue marketing their devices under the Android trademarks and with proprietary Google applications.  There is no evidence that Google used threats, misrepresented any facts, or used any other improper means.

b.  Violation of G. L. c. 93A.  Under c. 93A, § 11, it is Google's burden to demonstrate that "the center of gravity of the circumstances that [gave] rise to the claim" were not "primarily and substantially within the Commonwealth."  Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 470, 473 (2003).  Looking only to the allegedly unscrupulous conduct, factors to examine include, but are not be limited to, the place of conduct, and the "situs of loss."  Id. at 472 n.13, 474-475. We agree with the motion judge that Google has established, as matter of law, that c. 93A does not apply here.

At the relevant time, Google's headquarters was in California, Motorola's headquarters was in Illinois, and Samsung's headquarters was in South Korea. All of Google's allegedly unfair or deceptive acts, including its communications, both physical and electronic, occurred outside the Commonwealth. Although Massachusetts would be the situs of any royalty revenue lost to Skyhook from the sale to Massachusetts consumers of XPS-enabled Motorola and Samsung Android devices, that factor alone does not suffice to bring this dispute within the ambit of c. 93A, particularly in light of the global marketplace for such devices. Compare Yankee Candle Co. v. Bridgewater Candle Co., 107 F. Supp. 2d 82, 88 (D. Mass. 2000) (although plaintiff's headquarters was in Massachusetts, § 11 requirement not satisfied because alleged deception was "conceived and concocted outside Massachusetts" and was directed at plaintiff's customers, who were "overwhelmingly . . . persons and entities outside the Commonwealth"), aff'd, 259 F.3d 25, 47-48 (1st Cir. 2001).

On this record, Skyhook's physical location in Massachusetts was of minimal import. For this reason, if no other, Google was entitled to summary judgment on Skyhook's c. 93A claim.

<u>Judgment affirmed.</u>