NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1946                                          Appeals Court

  JNM HOSPITALITY, INC.  vs.  EDWIN McDAID & others,[1] trustees.[2]


No. 14-P-1946.

Norfolk.     January 19, 2016. - September 27, 2016.

Present:  Grainger, Rubin, & Milkey, JJ.


Condominiums, Parking, Common area.  Real Property, Condominium,
    Lease.  Landlord and Tenant, Execution of lease, Parking.
    Contract, Lease of real estate, Performance and breach,
    Interference with contractual relations.



    Civil action commenced in the Superior Court Department on
January 19, 2012.

    A motion for summary judgment was heard by Paul D. Wilson,
J., and entry of separate and final judgment was ordered by him.


    William E. Gens for the plaintiff.
    Henry A. Goodman for the defendants.


    GRAINGER, J.  This is an appeal from the dismissal of a

claim brought by the commercial tenant of a condominium unit

_____

    [1] Erica Crossen, Marie Fallon, David Rattray, and Carmine
Aquilino.

    [2] Of The Village at Forge Pond Condominium Trust.

owner against the condominium trustees. The plaintiff, JNM Hospitality, Inc. (JNM), appeals from the summary judgment in favor of the defendant trustees of The Village at Forge Pond Condominium Trust (collectively the trust) ordered by a judge of the Superior Court. JNM asserts that the trust's execution of a license agreement allowing employees of an abutting United States Postal Service (USPS) facility to use spaces in the vehicle parking lot of the condominium where JNM's restaurant was located constituted intentional interference in JNM's contract with its landlord. We disagree, and affirm the judgment.[3]

Background. For purposes of our consideration of the allowance of summary judgment, the facts are not in dispute. JNM operated a restaurant and bar on premises leased from Canton Viaduct, LLC, as assignee of the owner of two commercial units in The Village at Forge Pond Condominium, a mixed-use condominium complex in Canton. The trust is the condominium's governing entity. See G. L. c. 183A, §§ 8(i), 10. At issue are the provisions of JNM's lease governing the ability to provide vehicle parking spaces to its customers.

---

[3] The dispositions of other claims by JNM in its complaint, against the landlord, its principal, and one of the trustees in her individual capacity, are not before us in this review of the separate summary judgment.

The lease provisions relating to the number and location of parking spaces are both unclear and, due to handwritten revisions,[4] difficult to decipher.  The parties dedicate significant energy and many strained arguments to the meaning of lease provisions relating to this issue, with particular emphasis on so-called nonexclusive parking, i.e., spaces not reserved for any particular person or entity.

For purposes of reviewing factual allegations in the motion for summary judgment we adopt, as the law requires, the nonmovant plaintiff's wording of the contract.[5]  See Juliano v. Simpson, 461 Mass. 527, 529-530 (2012), quoting from Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).  Thus, we assume that the lease contemplated not only eleven parking spaces dedicated exclusively to JNM's customers,[6] but also JNM's right to allow its customers to park in other nonexclusive spaces, some sixty-six in number, available to visitors, owners,

---

[4] The parties struck phrases from the printed document, initialed changes, and substituted language that in one instance the motion judge considered "difficult to make out."

[5] The language in the contract from which JNM derives the right to make nonexclusive spaces available to its customers is the implication contained in an eight-word phrase that precedes the explicit grant of the eleven exclusive spaces: "Notwithstanding the common use of the parking facilities, Tenant shall have the exclusive use of the eleven (11) parking spaces . . . " (emphasis supplied).

[6] There is no dispute that the landlord had the requisite authority over the eleven exclusive spaces.

and residents of the condominium on a first-come, first-served basis.[7]

We also accept JNM's assertion that the license agreement allowing USPS employees to use a maximum of fifteen[8] spaces in the condominium property's parking lot made available fifty-one rather than sixty-six nonexclusive spaces to JNM's customers.[9] Additional facts appear below as they pertain to the issues.

Discussion.  A claim for intentional interference with contractual relations requires proof of four elements:  (1) a contract between the plaintiff and a third party, (2) the defendant's purposeful inducement of the third party to breach the contract in whole or in part, (3) the interference must be not only intentional, but also improper in motive or means of accomplishment, and (4) resulting harm to the plaintiff.  G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272

---

[7] The motion judge did not resolve all the parties' factual disputes over the contractual language in JNM's favor.  However, we do so as we review the grant of summary judgment de novo. See Miller v. Cotter, 448 Mass. 671, 676 (2007).

[8] Only twelve of these spaces are located in the parking lot; three are located on an adjoining unimproved road. However, for the purposes of summary judgment we use the larger number of fifteen as the number of spaces licensed to USPS.

[9] There are ninety-one total spaces, eight of which are in private garages and six of which are located down an unimproved road, not easily accessed.  The record reveals fifty-one nonexclusive spaces after deducting from the total number of spaces the private garage spaces, the unimproved road spaces, the spaces licensed to USPS, and JNM's exclusive spaces.

(1991), citing <u>United Truck Leasing Corp</u>. v. <u>Geltman</u>, 406 Mass. 811, 812-817 (1990).

1. <u>Contract breach</u>. The first element, the existence of a contract, is undisputed. On this record, however, JNM has not raised a genuine issue with respect to the second element, an induced breach of the lease or interference with the landlord's performance of its obligations.

The lease contains no guarantee, or even an inference, that the nonexclusive spaces will be available at any particular time or in any specified number; viewed in the light most favorable to JNM, the lease allows restaurant customers to compete with other visitors, residents and unit owners for available nonexclusive spaces in the lot. The lease contains no provision that precludes another unit owner or the trust from providing similar access to nonexclusive spaces to other tenants, or to third parties.[10] The lack of a guarantee that these spaces, or any of them, will be available at a given time does not render potential access under the contract meaningless, but it most certainly defeats a claim of interference when other individuals use what the parties have agreed explicitly are "nonexclusive"

---

[10] There is no basis to conclude that other unit owners or the trust would be bound by such a provision even had it been included in JNM's lease.

spaces.[11]  In this context it is notable that JNM's entire claim
relies on an eight-word phrase, "[n]otwithstanding the common
use of the parking facilities," presented as a preamble to
introduce the lease provision granting eleven spaces for the
exclusive use of restaurant customers.

JNM has conflated conduct by a stranger to the contract,
conduct that JNM claims has frustrated its own unilateral
expectation of possible use of a greater number of nonexclusive
spaces than became available in the condominium parking lot,
with conduct that "interfere[d] with the [other contracting]
party's . . . performance."  Harrison v. NetCentric Corp., 433
Mass. 465, 478 n.15 (2001), quoting from Restatement (Second) of
Torts § 766 comment k, at 12 (1979).  It is undisputed that the

---

[11] JNM's attempts to reverse the allowance of summary
judgment on a separate basis, namely interference with the use
of the eleven exclusive spaces particularly identified in the
lease, do not posit a genuine issue or rise to the level of
appellate argument.  See Mass.R.A.P. 16(a)(4), as amended, 367
Mass. 921 (1975).  These attempts rely on unsworn statements --
that postal employees parked throughout the lot (i.e., in
violation of the license granted by the trust) or that
condominium residents (not postal employees) parked in spaces
reserved for "businesses," and did so when those businesses were
not open -- and are unavailing under the strictures of
Mass.R.Civ.P. 56, 365 Mass. 824 (1974).

Moreover, JNM's submission of sworn testimony was to the
contrary:  According to JNM's president, "It was essential to
[JNM's] business operation to have the shared use of the common
parking facilities in addition to the exclusive [sic] of
[eleven] spaces.  The shared use of the common facilities is
more important than the exclusive use of eleven (11) spaces."
(Emphasis original.)

landlord itself (Canton Viaduct, LLC) engaged in neither an act nor an omission, and it is equally clear that the USPS license did not prevent the landlord from performing its contractual obligations.

2. <u>Remaining elements</u>. As stated, the failure to raise a genuine issue with respect to the element of a breach is fatal to JNM's case. While it is therefore unnecessary to address the remaining elements, the record provides additional independent bases for the allowance of summary judgment.

a. <u>Improper means or motive</u>. The record provides only two possible motives for the trust's license agreement with USPS: (1) containment of previous unauthorized use of the lot by USPS employees, and (2) generation of revenue for the condominium.[12] Neither of these satisfies the legal standard to establish an improper motive. See <u>Pembroke Country Club, Inc</u>. v. <u>Regency Sav. Bank, F.S.B</u>., 62 Mass. App. Ct. 34, 39 (2004). With respect to improper means, JNM's reliance on an alleged by-law violation, unaccompanied by any actual reprehensible conduct, presents no genuine dispute under our law, <u>KACT, Inc</u>. v. <u>Rubin</u>,

---

[12] JNM suggests that complaints or "harassment" by unidentified third parties (asserted, without any evidence, to be unnamed condominium residents) can satisfy the legal element of improper motive on the part of the actual defendants, the trustees, in executing the license agreement. This too fails to present a genuine justiciable dispute of material fact.

62 Mass. App. Ct. 689, 699-700 (2004), and merely trivializes the type of conduct that is intended to be actionable.

b. Resulting harm. The record reveals undisputed use of the parking spaces by USPS employees for the previous decade,[13] rendering any harm to JNM from the license, which simply formalized an existing situation, at best "speculative or conjectural." Chemawa Country Golf, Inc. v. Wnuk, 9 Mass. App. Ct. 506, 510 (1980).

Judgment affirmed.[14]

---

[13] JNM has not disputed evidence presented by the trust that JNM was not only aware of the incursion by USPS employees, but that JNM's owner complained openly and regularly about this preexisting problem for many years before the USPS license agreement was executed.

[14] The trust's request for appellate attorney's fees is denied.

MILKEY, J. (concurring in part).  I agree that JNM Hospitality, Inc. (the restaurant), cannot prevail on the intentional interference with contractual relations claim it brought against the trustees of The Village at Forge Pond Condominium Trust (the trust).  However, I arrive at that conclusion by a narrower path.

The special permit under which the condominium complex was built required that there be ninety-one parking spaces for the residents of the residential units and the customers and staff of the commercial units (one space per residential bedroom, plus one space per 250 square feet of commercial space).  Pursuant to that formula, the commercial units occupied by the restaurant accounted for eleven of the mandated ninety-one parking spaces.  Consistent with that figure, the owner of the two restaurant units claimed an entitlement to eleven parking spaces adjacent to its units,[1] and executed a lease purporting to give the restaurant exclusive use of those spaces.  Those eleven spaces were then marked with signs designating them for the restaurant's exclusive use.[2]

---

[1] The owner of the units that executed the lease was Forge Pond, LLC.  Forge Pond, LLC, has since assigned its rights to Canton Viaduct, LLC, a defendant in the broader case brought by the restaurant.

[2] The parties to this appeal have taken the position that the restaurant had valid exclusive rights to these eleven spaces.  For purposes of this appeal, I do as well.

At least for purposes of this appeal, I accept the restaurant's position that the lease did not prohibit it from using spaces elsewhere in the parking lot if they were available. This is evidenced by the fact that the parties to the lease crossed out a draft provision that expressly would have limited the restaurant to using only its dedicated eleven spaces. However, although the lease does not appear to have prohibited the restaurant from making use of other available spaces, neither did it provide the restaurant any enforceable entitlement to such spaces. Indeed, had the landlord purported to give the restaurant an entitlement to more than its pro rata share, it would have been giving away parking rights that it did not possess. Under these circumstances, the trust's licensing to the United States Postal Service the right to use fifteen parking spaces other than the restaurant's dedicated eleven could not have caused the landlord to violate the lease.[3]

I therefore concur with so much of part 1 of Justice Grainger's opinion as concludes that the breach of contract element of the interference claim was not met where, under the circumstances of this case, the contract provided no enforceable

---

[3] None of this is to say that the trust's decision to license parking to the United States Postal Service was well advised, especially where it reduced available parking at the complex below that required by the special permit. However, the only legal issue before us is whether the decision rendered the trust liable to the restaurant on a particular cause of action (intentional interference with the restaurant's lease).

entitlement to any of the nonexclusive parking spaces.[4]  I do not reach any other ground for affirmance.

---

[4] I also agree that the trust should not recover its appellate attorney's fees.

RUBIN, J. (dissenting).  Viewing the evidence in the light most favorable to the plaintiff, which operated a restaurant in commercial space in The Village at Ford Pond Condominium, the defendant trustees of The Village at Forge Pond Condominium Trust (trust) knowingly made it impossible for the plaintiff's landlord to perform its contractual obligation to provide a certain number of nonexclusive use parking spaces to the plaintiff for use of its patrons.  The majority holds that reducing the number of nonexclusive use spaces by assigning them for a third party's exclusive use -- excluding patrons from using them -- was not a breach of the lease.  Because the majority's affirmance on this ground rests upon a reading of the contract between the plaintiff and its landlord that renders an important bargained-for provision concerning parking available to the restaurant's customers essentially meaningless -- a reading not advanced even by the trust -- it is incorrect.  Because the majority improperly denies the plaintiff its day in court, I respectfully dissent.

Background.  Viewing the summary judgment record in the light most favorable to the nonmovant plaintiff, a finder of fact could find the following:  The plaintiff JNM Hospitality, Inc. (JNM), operated Centerfields Bar and Grill (Centerfields) in space it leased in The Village at Forge Pond Condominium in Canton, which contains both residences and 8,000 square feet of

commercial space.  JNM's landlord, Canton Viaduct, LLC (Canton Viaduct), was the assignee of the owner of two of the five commercial units in the condominium, which were combined to form the premises leased to JNM.

Adequate parking was essential to the success of the restaurant.  According to a decision of the zoning board of appeals of Canton dated June 14, 2001, the condominium was required to have one parking space for each of the fifty-nine residential units as well as one parking space for each 250 square feet of the 8,000 total square feet of commercial space, or thirty-two additional spaces, for a total of ninety-one parking spaces.  The condominium had these spaces.

Of the ninety-one spaces, Canton Viaduct had eleven parking spaces immediately in front of the entrance to the restaurant, designated for the exclusive use of Canton Viaduct's tenant.  Another eight of the spaces were owned appurtenant to specific units and were designated for the exclusive use of those units.  Six spaces were at the end of a dirt road and were unusable.

It thus appears that there were sixty-six remaining usable spaces at the condominium that were not designated for any owner's or tenant's exclusive use.  Under the master deed of the condominium, unit owners, including the landlord, were entitled

to the nonexclusive use of these common parking spaces.[1] These shared or common parking spaces were available for the use of condominium owners on a first-come, first-served basis.

a. The lease. JNM and Canton Viaduct entered into a lease agreement[2] that addressed, inter alia, parking spaces. A draft lease was sent by Canton Viaduct to counsel for JNM. That counsel made handwritten changes on the documents. Those changes were initialed by both parties and the contract was signed.

Paragraph 2 of the agreement includes language related to parking. It provides that "[n]otwithstanding the common use of the parking facilities, Tenant shall have the exclusive use of the eleven (11) parking spaces marked on Exhibit A [to the lease]. . . . Based on 2,600 square feet, the number of spaces

---

[1] I say it "appears" there were sixty-six usable common parking spaces because there is some confusing evidence suggesting that there may have been some "residents only" spaces that may not properly be counted as common spaces to which JNM and its customers had access. The precise number of shared or common parking spaces is immaterial, since this case is about the diminution in the number of spaces rather than the absolute number available.

[2] The lease document lists the landlord as "Forge Pond, LLC." The parties, however, have agreed that JNM is the tenant of Canton Viaduct under this lease. JNM alleges in the complaint, and the trust agrees in its brief, that the lease was assigned by Forge Pond, LLC, to Canton Viaduct. Neither party argues that this assignment is material to the suit. Thus, for the purposes of this opinion, I treat JNM and Canton Viaduct as though they were the original parties to the lease.

to be provided is eleven (11) spaces as required by Canton Zoning Regulations."[3]

The parties disagree as to whether the first clause of this provision conveyed to JNM the landlord's right to the nonexclusive use of the common parking spaces that it held as part of its ownership of the leased condominium units, or only the eleven exclusive-use spaces.  It does the former -- and I note that the motion judge's grant of summary judgment was based entirely on his erroneous conclusion to the contrary.

Immediately after what is now the concluding clause of the parking provision, "Tenant shall have the exclusive use of the eleven (11) parking spaces marked on Exhibit A," the initial draft included another phrase that was struck by counsel for JNM, a deletion initialed by both parties.  It read, "but shall have no right to use of any other parking spaces located on the premises and landlord shall provide Tenant with one space per 250 square feet (excluding basement space)."  Had this language

---

[3] Paragraph 8 of the agreement states, "Tenant's use and operation may under no circumstances interfere with the quiet use and enjoyment of other tenants in the buildings and Tenant specifically agrees . . . that employees and patrons shall not park vehicles in any area of the property."  Read literally, this would mean that JNM was not entitled to use any parking spaces as part of the lease agreement, but was expressly forbidden from doing so.  The trust, however, concedes that the eleven exclusive spaces referred to in paragraph 2 were bargained for, and presses no argument that paragraph 8 means that JNM was not entitled to use whatever parking was provided for by paragraph 2.  Consequently, I need not address paragraph 8 further.

not been struck, the contract would have meant that JNM had the right to use only the eleven exclusive-use spaces.  That it was struck indicates the parties intended that JNM would be able to use the nonexclusive spaces.

The judge below reached the opposite conclusion by accepting the trust's substitution, in its rendering of the deleted phrase, of the word "[the]," which it placed in brackets, for the word "no."  In the trust's rendition, the crossed-out phrase read "shall have [the] right" to use common parking spaces, rather than "shall have no right" to use the common spaces.

The judge recognized that the word in the stricken phrase is not "the."  He wrote, "in the copy of the lease in the summary judgment record, it is difficult to make out the word for which the [trust] has substituted the word 'the.'"

We have the same copy of the lease before us.  To be sure, there are artifacts of photocopying that partially obscure the word.  Nonetheless, the judge seemed to recognize what is obviously true from examining the document, it is a two-letter word.  The judge suggested that the word might be "an," but that is obviously incorrect and, as the judge observed, that would also be "ungrammatical."  The judge further observed that the original word "might also be 'no,' which would rather dramatically change the meaning of that portion of the stricken

language."  The judge, however, concluded that the word "no" "would be inconsistent with the text of the provision as a whole."

An examination of the document makes clear, however, that the word is, fairly obviously, "no."  It certainly does dramatically change the meaning of the stricken language from what the judge read it to mean.

But it is not inconsistent with the text of the provision as a whole.  Indeed, it essentially resolves any ambiguity in paragraph 2, and makes clear that the meaning of the text of the provision as a whole is the opposite of what the judge concluded.

The judge wrote, "I accept the substitution of the word 'the' as accurate, because [p]laintiff did not disagree with it in its own brief, nor did [p]laintiff object when counsel for the [trust] used the word 'the' when he read that stricken language at oral argument.  Counsel for Canton Viaduct, the other party to the [l]ease, was also present at oral argument, and similarly made no comment when counsel for the [trust] used the word 'the.'"

A judge may not accept a word as "accurate" when it obviously is not, at least when it comes to the reading of a legally operative text.  Indeed, even if a party could waive a claim about what in fact the words in a document in the record

are, there was nothing rising to the level of waiver (for example, a failure to object to the admission of evidence) in what JNM did.  The lease thus conveyed to JNM the landlord's right to the nonexclusive use of the common parking spaces.

b.  The USPS agreement.  Following the signing of the lease agreement, the restaurant opened.  The restaurant operated continually between March, 2003, and January 1, 2013, when it closed down.

The restaurant operated successfully for many years.  In May, 2010,[4] the trust entered into a license agreement with the United States Postal Service (the USPS agreement), which maintained a facility adjacent to the parking area of the condominium.  The USPS agreement allowed USPS to park its vehicles in fifteen of the nonexclusive use spaces.  In exchange for this, USPS agreed to pay the trust $936 dollars per month.  One of the trust's reasons for entering into the USPS agreement was to make money in order not to raise condominium fees.  There was also evidence that certain unit owners harassed Centerfields by, among other things, pouring buckets of water onto patrons from a balcony above the restaurant's deck, videotaping patrons from a window above the restaurant's entrance, and making

---

[4] Although the text of the agreement states that it was entered into on May 1, 2010, the last page, headed "Acceptance by the Postal Service," was manually signed and dated December 14, 2010.  However, the parties appear to agree that the trust entered into the agreement with USPS "on or about May 1, 2010."

repeated telephone calls to the restaurant threatening to call the police about the noise.

Business at Centerfields was steady until the USPS agreement went into effect, when it declined sharply. JNM provided an affidavit from a former general manager of the restaurant attesting to the fact that "[s]ince the [p]ost [o]ffice has been allowed to park in the [c]ondominium lot, our lunch trade and [e]arly [b]ird dinner trade has been reduced to the point that it is almost completely gone. The restaurant used to do a thriving lunch and [e]arly [b]ird dinner business and now the restaurant is nearly empty at those times."

JNM also provided an affidavit from a former bartender attesting to the fact that "[s]ince the post office employees ha[d] been parking in the [c]ondominium parking lot" customers had been complaining constantly about the lack of parking, and the restaurant had lost sixty to seventy percent of its lunch customers and seventy-five to eighty percent of its early bird diners. An affidavit from JNM's accountant stated that "[d]uring 2010 and through 2012 the sales declined sharply and steadily through the [three]-year period . . . . [T]he continued decrease in sales [was] not consistent with the last [fourteen] years of operation."

Viewing the summary judgment record in the light most favorable to JNM, the USPS use of the spaces reduced

dramatically the number of nonexclusive use spaces available to JNM. In addition, the placement of USPS trucks also blocked its use of the eleven exclusive use parking spaces. And, as a consequence, JNM's business suffered and ultimately failed.

Discussion. "In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). The second prong may be satisfied not only by a showing that the defendant induced the third party to break the contract, but by a showing that its actions knowingly made it impossible for the third party to perform its contract. See Restatement (Second) of Torts § 766 & comment h (1979); Cardone v. Boston Regional Med. Center, Inc., 60 Mass. App. Ct. 179, 188-191 (2003) (reversing grant of summary judgment on intentional interference claim and holding that there was genuine issue of material fact whether defendant used improper means when it knowingly violated contract to compensate third party, which then breached its contract to compensate plaintiff). See also Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 619 (2014) (second

prong undisputedly satisfied when Google exercised rights under its contract with Motorola to prevent Motorola from shipping devices containing plaintiff's software, causing Motorola to withdraw from its contract with plaintiff to include plaintiff's software on its devices).

a. <u>Did the trust's actions knowingly make it impossible for the landlord to perform its contractual obligation with respect to parking?</u>  There is sufficient evidence in the summary judgment record to support a finding that the trust's agreement with USPS made it impossible for the landlord to perform its obligation under the lease, and that, since the trust has not argued that it did not know of the lease, that interference was knowing.

The motion judge concluded that although JNM had evidence that could satisfy the first of the tort's elements, there was insufficient evidence to satisfy the second.  The basis for this conclusion was the motion judge's construction of the contract reading it to be limited to providing only eleven exclusive use parking spaces to JNM.  Without addressing the evidence that even the use of these eleven spaces was compromised because of the USPS agreement -- evidence that, the trust argues, by itself might require reversal of summary judgment to the extent JNM's claim relies on interference with its right to use those spaces -- the judge concluded that, because JNM had no entitlement

under the lease to use whatever common parking spaces were available, JNM would be unable to show that the landlord was unable to fulfil the terms of the lease because of the trust's actions.

Both the lead opinion and the concurrence take another tack, concluding that because the spaces given to USPS by the trust were for the "nonexclusive use" of the unit owners and their lessees, the trust's action reducing the number of those spaces did not interfere with Canton Viaduct's performance under the contract.

Not even the trust makes this argument, and for good reason. The linchpin of the majority's argument is that "[t]he lease contains no provision that precludes . . . the trust from providing similar access to nonexclusive spaces to . . . third parties." Ante at    . Under this reading, JNM, a commercial party planning to operate a restaurant, in seeking a contractual right to use the "nonexclusive use" spaces bargained for what amounts to a meaningless term. Under the contract as so construed, nonexclusive-use spaces that would once have been available only to the restaurant and other tenants of the condominium on an equal footing may be rented out to a third party, reducing the availability of those spaces for restaurant patrons, and there will be no violation of the contract. That is obviously wrong.

The majority concludes that the lease does not guarantee or entitle JNM to use any specified number of nonexclusive use spaces. But there is, in fact, evidence in the summary judgment record that would support a finding by a jury that it was unlawful for the trust to license these spaces to USPS. The trust reduced the number of available parking spaces for occupants of the condominium to a number below what was required both by zoning by-law and for approval of the site plan and issuance of a special permit for the development by the zoning board of appeals. In bargaining for its lease, JNM was entitled to rely upon these limitations on reducing the number of nonexclusive use spaces for which its patrons were entitled to compete. They need not have been contained in the lease for the trust's agreement with USPS to render impossible Canton Viaduct's performance of its contractual obligation to make the legally required number of nonexclusive use spaces available. Consequently, the summary judgment should be reversed.

b. <u>Other grounds for affirmance</u>. The third and fourth elements of tortious interference with contractual relations appropriately remained unaddressed by the judge below, and the trust has not argued for affirmance on these alternative

grounds.  Nonetheless, because the lead opinion addresses those elements, I do so as well.[5]

The third element requires either improper "means" or an improper "motive."  "[T]he plaintiff need not prove both." Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006).

As to means, the evidence that the agreement with USPS reduced the number of available parking spaces to a number below what was required both by zoning by-law and for approval of the site plan and issuance of a special permit for the development suffices to raise a genuine issue of material fact on this jury question.

I disagree that in order to prove improper means there must be some "actual reprehensible conduct" distinct from any violation of a statute or regulation.  Ante at    .  We have held that "[i]mproper means include violation of a statute or common-law precept."  Cavicchi, supra.  To be sure, "even when there is a violation of statute or common-law rule, there must be a case-by-case evaluation," and "not every such violation constitutes improper means."  KACT, Inc. v. Rubin, 62 Mass. App. Ct. 689, 699 (2004).  Thus, in KACT, Inc., supra at 700, a violation of condominium documents and thus G. L. c. 183A by condominium trustees in proposing rules and regulations for

---

[5] The concurring opinion would not reach and does not address these elements.

operation of a restaurant was held not to amount to improper means "at least as to the plaintiffs" where the plaintiffs, through acquiescence over many years, "had waived any violation of the statute, as well as any violation of the provisions of the master deed and by-laws."

But the evidence on the question of impropriety in this case is at least sufficient to go to a jury. Indeed, to reach the opposite conclusion, we would have to hold that the trust might have leased out the entire parking lot to a third party in violation of the zoning by-law, depriving the great majority of the tenants in the condominium of any place to park, and that none might have redress for this interference with his or her lease because, as a matter of law, the trust did not use "improper means."

As to "motive," a genuine issue of material fact exists because the record evidence shows that although the trust could revoke the USPS agreement at will, it took no action even after JNM informed the trust in June of 2011 that the lack of parking was hurting its business and that the USPS agreement violated the special permit.[6]

---

[6] There is also evidence in the summary judgment record that some condominium residents objected to Centerfields's presence, and that may have engendered ill will towards Centerfields among the trustees. See Adcom Prods., Inc. v. Konica Bus. Machs. USA, Inc., 41 Mass. App. Ct. 101, 105 (1996) (motive of retaliation or ill will is improper).

As for the fourth element, there is in the record sufficient evidence that JNM was harmed by the trust's actions that the question must go to a jury. Drawing every reasonable inference in favor of JNM, the evidence supports a conclusion that the parking situation was far worse after the trust entered its agreement with USPS. Whether the loss of nonexclusive use spaces harmed JNM is a quintessential jury question. If we view the evidence as we must, in the light most favorable to JNM, we cannot resolve it in the trust's favor.

Conclusion. Because the trust's motion for summary judgment should not have been allowed, I respectfully dissent.